ACCEPTED
03-14-00340-CV
5210597
THIRD COURT OF APPEALS
AUSTIN, TEXAS
5/8/2015 12:32:17 PM
JEFFREY D. KYLE
CLERK

## No. 03-14-00340-CV

## IN THE THIRD COURT OF APPEALS
## AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
5/8/2015 12:32:17 PM
JEFFREY D. KYLE
Clerk

## APPELLANTS, CPS ENERGY, TIME WARNER CABLE TEXAS LLC, AND SOUTHWESTERN BELL TELEPHONE COMPANY D/B/A AT&T// CROSS-APPELLANT, PUBLIC UTILITY COMMISSION OF TEXAS

## V.

## APPELLEE, PUBLIC UTILITY COMMISSION OF TEXAS// CROSS-APPELLEE, CPS ENERGY, TIME WARNER CABLE TEXAS LLC AND SOUTHWESTERN BELL TELEPHONE COMPANY D/B/A AT&T

**On appeal from D-1-GN-13-001238 (Consolidated)
in the 250th Judicial District Court, Travis County, Texas**

### POST SUBMISSION BRIEF OF APPELLANT CPS ENERGY

**CPS ENERGY**

Gabriel Garcia
ggarcia@cpsenergy.com
Carolyn Shellman
cshellman@cpsenergy.com

CPS Energy
145 Navarro
P.O. Box 1771
San Antonio, Texas 78296
(210) 353-5689 (Voice)
(210) 353-6832 (Facsimile)

**HERRERA & BOYLE, PLLC**

Alfred R. Herrera
State Bar No. 09529600
aherrera@herreraboylelaw.com

816 Congress Avenue, Suite 1250
Austin, Texas 78701
(512) 474-1492 (Voice)
(512) 474-2507 (Facsimile)

**May 8, 2015**

# IDENTITY OF PARTIES AND COUNSEL

The following is a complete list of all parties to the trial court's judgment, and the names and addresses of all trial and appellate counsel:

| Counsel for Public Utility Commission of Texas: | Counsel for CPS Energy: |
|---|---|
| Douglas Fraser<br>Megan Neal<br>Office of the Attorney General<br>P.O. Box 12548, Capitol Station<br>Austin, Texas 78711-02548<br>Phone: (512) 463-2012<br>Fax: (512) 457-4610<br>douglas.fraser@texasattorneygeneral.gov<br>megan.neal@texasattorneygeneral.gov | Alfred R. Herrera<br>HERRERA & BOYLE, PLLC<br>816 Congress Avenue, Suite 1250<br>Austin, TX 78701<br>Phone: (512) 474-1492<br>Fax: (512) 474-2507<br>aherrera@herreraboylelaw.com |
| **Counsel for AT&T Texas:**<br><br>Paul A. Drummond<br>Natalie L. Hall<br>AT&T Legal Department<br>1010 N. St. Mary's, 14th Floor<br>San Antonio, Texas 78215<br>Phone: (210) 351-4830<br>Fax: (210) 886-2127<br>paul.drummond@att.com<br>natalie.hall@att.com | **Counsel for CPS Energy:**<br><br>Gabriel Garcia<br>Carolyn Shellman<br>CPS Energy<br>145 Navarro<br>P.O. Box 1771<br>San Antonio, TX 78296<br>Phone: (210) 353-5689<br>Fax: (210) 353-6832<br>ggarcia@cpsenergy.com<br>cshellman@cpsenergy.com |

| Counsel for AT&T Texas: | Counsel for AT&T Texas: |
|---|---|
| Michael T. Sullivan<br>Mayer Brown LLP<br>71 S. Wacker Drive<br>Chicago, IL 60606<br>Phone: (312) 782-0600<br>Fax: (312) 706-8689<br>msullivan@mayerbrown.com | J. David Tate<br>Katherine C. Swaller<br>Thomas Ballo<br>AT&T Legal Department<br>816 Congress Avenue, Suite 1100<br>Austin, Texas 78701<br>Phone: (512) 457-2304<br>Fax: (512) 870-3420<br>jon.david.tate@att.com<br>katherine.swaller@att.com<br>thomas.ballo@att.com |
| **Counsel for Time Warner Cable Texas LLC:** | **Counsel for Time Warner Cable Texas LLC:** |
| Valerie P. Kirk<br>Melissa Lorber<br>Enoch Kever PLLC<br>600 Congress Avenue, Suite 2800<br>Austin, Texas 78701<br>Phone: (512) 615-1200<br>Fax: (512) 615-1198<br>vkirk@enochkever.com<br>mlorber@enochkever.com | J.D. Thomas<br>J. Aaron George<br>Sheppard Mullin Richter & Hampton LLP<br>1300 I Street, N.W.<br>11th Floor East<br>Washington DC 20005<br>Phone: (202) 218-0000<br>Fax: (202) w218-0020<br>dthomas@sheppardmullin.com<br>ageorge@sheppardmullin.com |

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ................................................... i

TABLE OF CONTENTS................................................................... iii

INDEX OF AUTHORITIES ................................................................ iv

STATEMENT OF FACTS ................................................................1

SUMMARY OF ARGUMENT ...................................................................2

ARGUMENT ...........................................................................3

Findings of Fact 84-87 and Conclusions of Law 26 and 27 are Improper Advisory Opinions .........................................................3

The Uniform Declaratory Judgment Act does not Apply to this Case ........7

Findings of Fact 84-87 and Conclusions of Law 26 and 27 Result in an Unconstitutional Delegation of Power ...................................................9

CONCLUSION.......................................................................9

CERTIFICATE OF SERVICE ................................................... 11

CERTIFICATE OF COMPLIANCE.......................................... 12

# INDEX OF AUTHORITIES

**Cases**

*Brinkley v. Texas Lottery Comm'n*, 986 S.W.2d 767 (Tex. App.—
Austin 1999, no pet.) ........................................................................ 4, 5

*Central Power & Light Co. v. Public Util. Comm'n*, 36 S.W.3d 547
(Tex.App.-Austin 2000, pet. denied) .................................................. 7

*City of Waco v. Tex. Nat. Res. Conservation Comm'n*, 83 S.W.3d 169
(Tex. App.—Austin 2002, pet. denied) ............................................ 5, 8

*Firemen's Ins. Co. v. Burch,* 442 S.W.2d 331 (Tex. 1969) ............................ 8

*Railroad Comm'n v. CenterPoint Energy Res. Corp.*, 03–13–00533–
CV, 2014 WL 4058727, at *2-3 (Tex. App.—Austin, no pet.) ........... 5

*Robinson v. Parker*, 353 S.W.3d 753 (Tex. 2011) ..................................... 5, 7

*Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440
(Tex. 1993) ...................................................................................... 5, 8

*Trinity Settlement Servs., LLC v. Texas State Secs. Bd.*, 417 S.W.3d
494 (Tex. App.—Austin 2013, pet. denied) ....................................... 5

*TXU Electric v. Public Utility Commission*, 51 S.W.3d 275
(Tex. 2001) ......................................................................................... 5

**Statutes and Rules**

47 C.F.R. §1.1409(e) .............................................................. 1, 3, 4, 6

TEX. CIV. PRAC. & REM. CODE §§ 37.001–.011 ........................................ 8

TEX. GOV'T CODE ANN. § 2001.174 ......................................................... 7

TEX. UTIL. CODE ANN. § 54.204 ........................................................... 3, 7

TEX. UTIL. CODE ANN. § 54.204(c) ..................................................... 2, 4, 9

TEX. UTIL. CODE ANN. § 54.205 .............................................................. 3

# STATEMENT OF FACTS

The Court entertained oral argument in this case on April 22, 2015. On April 20, 2015, the Public Utility Commission ("Commission"), through its attorney, the Attorney General of Texas ("Attorney General"), filed a letter in which the Commission asserted that the Court does not have jurisdiction to decide whether the Commission's ruling regarding the applicability of amendments the Federal Communications Commission ("FCC") adopted with an effective date of June 8, 2011 was correct. As the Attorney General's Letter states, "[t]hose amendments [to 47 C.F.R. 1.1409(e)] became effective on June 8, 2011 — several months after the time period for which the Commission determined the maximum allowable pole-attachment rate."[1]

Thus, the Commission's Findings of Fact 84-87 and Conclusions of Law 26 and 27 purported to address rights and facts which have not arisen and thus the Commission adjudicated matters which are contingent, uncertain, or rest in the future, thereby comprising an advisory opinion. As stated in the Attorney General's Letter, "we determined the Court does not

---

[1] *See* Letter from Megan Neal, Assistant Attorney General to Honorable Jeffrey D. Kyle, Clerk, Court of Appeals, Third District of Texas (April 20, 2015) ("Attorney General's Letter") (addressing CPS Energy's Appellant's Point of Error No. 2, Findings of Fact 84-87, and Conclusion of Law 27).

have jurisdiction to decide one of the issues … [t]his Court and the Texas Supreme Court have held that statements about the future are advisory[2] … ."

## SUMMARY OF ARGUMENT

CPS Energy agrees with the Attorney General that the Commission issued an advisory opinion regarding the applicability of the June 8, 2011 amendments to the FCC's rules. As CPS Energy explained at oral arguments, in this proceeding the Commission has consistently over-reached in applying its limited authority to CPS Energy, a municipally owned utility ("MOU"). This issue is yet another example of the Commission exceeding its jurisdiction in reviewing the disputes in this case.

CPS Energy respectfully urges the Court to reverse the Commission's Order on Rehearing with regard to Findings of Fact 84-87 and Conclusions of Law 26 and 27 because those determinations are improper advisory opinions.

Should the Court conclude that the Commission's decision regarding the applicability of the FCC's amended rules is not an advisory opinion, nonetheless the Court should reverse the Commission's ruling because the

---

[2]     The Attorney General's Letter does not refer to Conclusion of Law 26, but that conclusion of law suffers from the same flaws as Conclusion of Law 27.

Commission's interpretation of Utilities Code § 54.204(c) would result in an unconstitutional delegation of power to a federal agency.[3]

## ARGUMENT

### Findings of Fact 84-87 and Conclusions of Law 26 and 27 are Improper Advisory Opinions

The Commission limited its review in this proceeding to the billing years 2005 through 2010, which also matched the evidence in the record. *See* Conclusion of Law 24 ("[t]he inputs set out in the findings of fact are reasonable for use in the Maximum rate formula for test years 2004 through 2009 (billing years 2005 through 2010)"); Conclusion of Law 25 ("[t]he maximum allowable pole-attachment rates set forth in the findings of fact for test years 2004 through 2009 (billing years 2005 through 2010) comply with PURA §§ 54.204 and 54.205"); Findings of Fact 42-83A (all limited to billing years 2005 though 2010).

However, the Commission then went outside the record before it and unnecessarily concluded that the June 8, 2011 amendments to 47 C.F.R. 1.1409(e) applied prospectively to the parties. *See* Conclusions of Law 26 and 27 (Conclusion of Law 26: "Changes in 47 U.S.C. § 224(e) are

---

[3] *See* Brief of Appellant, CPS Energy at 16-21 (September 5, 2014) ("CPS Brief") (addressing delegation issue in Point of Error No. 2).

incorporated into PURA § 54.204 without legislative action;" and Conclusion of Law 27: "[t]he FCC's June 8, 2011 amendment to 47 C.F.R. 1.1409(e) applies to CPS Energy under PURA § 54.204(c)"); Findings of Fact 84-87 (describing the "Methodology Going Forward").[4] Further, the Commission made the sweeping conclusion that not only did law June 8, 2011 amendment affecting the Telecom Formula apply to the parties, but that any future changes to FCC regulations that govern pole attachment rates are incorporated into PURA § 54.204 without action by the Texas Legislature.

As conceded by the Attorney General's Letter, these conclusions were advisory only. *See* Attorney General's Letter at 1 ("we determined the Court does not have jurisdiction to decide one of the issues … [t]his Court and the Texas Supreme Court have held that statements about the future are advisory … .")

"The separation-of-powers doctrine prohibits courts from issuing advisory opinions." *Brinkley v. Texas Lottery Comm'n*, 986 S.W.2d 767, 770 (Tex. App.—Austin 1999, no pet.) "The distinctive feature of an advisory opinion is that it decides an abstract question of law without

---

[4] The Commission in its Order on Rehearing made similar statements. *See,* Commission's Order on Rehearing at 6 and 22.

binding the parties." *Brinkley*, 986 S.W.2d at 767; *citing Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993). "The court will not declare rights on facts which have not arisen or adjudicate matters which are contingent, uncertain, or rest in the future." *Brinkley* at 768. "An opinion issued in a case that is not ripe would address only a hypothetical injury rather than remedying actual or imminent harm." *City of Waco v. Tex. Nat. Res. Conservation Comm'n*, 83 S.W.3d 169, 175 (Tex. App.—Austin 2002, pet. denied). "Ripeness 'is a threshold issue that implicates subject matter jurisdiction ... [and] emphasizes the need for a concrete injury for a justiciable claim to be presented.'" *Robinson v. Parker*, 353 S.W.3d 753, 755 (Tex. 2011).

A decision by a state agency that is advisory or unripe is similarly invalid. *See TXU Electric v. Public Utility Commission*, 51 S.W.3d 275, 287 (Tex. 2001) (holding that the Commission's prospective adjustment for acquired debt was advisory and thus premature); *R.R. Comm'n v. CenterPoint Energy Res. Corp.*, 03–13–00533–CV, 2014 WL 4058727 at *2-3 (Tex. App.—Austin, no pet.); *citing Trinity Settlement Servs., LLC v. Texas State Secs. Bd.*, 417 S.W.3d 494, 506 (Tex. App.—Austin 2013, pet. denied) ("[i]n the administrative-law context, moreover, avoiding premature litigation over administrative determinations prevents courts from

'entangling themselves in abstract disagreements over administrative policies …'").

In this case the parties provided evidence for the 2005-2010 billing years and the Commission made findings based on that evidence. The Commission's analysis of the June 8, 2011 amendments to 47 C.F.R. 1.1409(e), which was incorporated into the case as a result of the Conclusion of Law 26, had no bearing on the evidence before it. As the Attorney General's Letter concedes, "those amendments [to 47 C.F.R. 1.1409(e)] became effective on June 8, 2011 — several months after the time period for which the Commission determined the maximum allowable pole-attachment rate." The Commission's Findings of Fact 84-87 and Conclusions of Law 26 and 27, therefore, "declare[d] rights on facts which have not arisen or adjudicate[d] matters which are contingent, uncertain, or rest in the future," in violation of the Court's ruling in *Brinkley* and similar cases. *Brinkley,* 986 S.W.2d at 768.

CPS Energy respectfully urges the Court to adopt the Commission's concession that Findings of Fact 84-87 and Conclusions of Law 26 and 27 were advisory opinions. As CPS Energy discusses above, the Commission made determinations of facts and law unripe for decision. The effect of such findings is to remove the Commission's subject matter jurisdiction to issue

those findings and conclusions. *See Robinson,* 353 S.W.3d at 755 ("[r]ipeness 'is a threshold issue that implicates subject matter jurisdiction'…"). CPS Energy thus respectfully urges the Court to find that the Commission's determinations have no legal effect and to reverse the Commission's Order on Rehearing regarding Findings of Fact 84-87 and Conclusions of Law 26 and 27.[5]

## The Uniform Declaratory Judgment Act does not Apply to this Case

At the oral argument, AT&T argued that the Commission's findings were not advisory opinions because the case was brought as a declaratory judgment action. AT&T's argument lacks merit for two reasons.

First, CPS Energy did not file the case under the Uniform Declaratory Judgment Act ("UDJA"). CPS Energy instead filed the case as a petition for enforcement under Utilities Code § 54.204. Indeed, the style of the case is "*Petition of CPS Energy for Enforcement Against AT&T Texas and Time Warner Cable Regarding Pole Attachments*" and CPS Energy's petition was

---

[5]   It is appropriate for the Court to reverse the Commission's decision in this case if the decision prejudices substantial rights of CPS Energy. TEX. GOV'T CODE ANN. § 2001.174 (West 2000); *Central Power & Light Co. v. Public Util. Comm'n*, 36 S.W.3d 547, 561-562 (Tex.App.—Austin 2000, pet. denied). In this case, Time Warner Cable Texas LLC ("Time Warner") is seeking damages against CPS Energy in a related case in Bexar County District Court. If the Commission's advisory opinion about the FCC's June 8, 2011 amendments stands untouched, Time Warner will undoubtedly use that opinion to seek damages against CPS Energy in the Bexar County litigation. Therefore, CPS Energy's substantial rights will be prejudiced and it is appropriate to reverse the Commission's decision.

titled "Petition and Request for Enforcement of CPS Energy."  Order on Rehearing at 1.   Therefore, any case law interpreting the UDJA is inapplicable to this case.  *See, e.g., City of Waco,* 83 S.W.3d at 177 (analyzing ripeness requirements for UDJA actions).

Second, even if considered to be a declaratory judgment action, Texas courts have consistently held that a declaratory judgment action does not expand a tribunal's subject matter jurisdiction.  "[W]e have interpreted the Uniform Declaratory Judgments Act, TEX. CIV. PRAC. & REM. CODE §§ 37.001–.011, to be merely a procedural device for deciding cases already within a court's jurisdiction rather than a legislative enlargement of a court's power, permitting the rendition of advisory opinions."  *Tex. Ass'n of Bus.,* 852 S.W.2d at 444; *see also Firemen's Ins. Co. v. Burch,* 442 S.W.2d 331, 333 (Tex. 1969) ("the Legislature could not and has not by the passage of the Uniform Declaratory Judgments Act, empowered the district courts to render advisory opinions").  Consequently, even had the parties filed a declaratory judgment action, which they did not, the Commission would have lacked subject matter jurisdiction to issue Findings of Fact 84-87 and Conclusions of Law 26 and 27 since those determinations were advisory and unripe.

**Findings of Fact 84-87 and Conclusions of Law 26 and 27 Result in an Unconstitutional Delegation of Power**

If the Court concludes that the Commission's decision regarding the applicability of the FCC's June 8 2011 amendments to its rules were not an advisory opinion, then as CPS Energy explained in its Point of Error No. 2, the Commission's interpretation of Utilities Code § 54.204(c) results in an unconstitutional delegation of power to a federal agency. *See* CPS Brief at 16-21. CPS Energy respectfully refers the Court to its briefs for its arguments on that issue. *Id*.

**Conclusion**

The Commission exceeded its jurisdiction on several occasions and Findings of Fact 84-87 and Conclusions of Law 26 and 27 are examples of this overstepping of jurisdictional authority. *See* CPS Brief at 16-47 (Points of Error Nos. 2-5). As the Attorney General recognized, the Commission issued an advisory opinion about the applicability of the June 8, 2011 amendments to the FCC's rules. The record only addressed billing years 2005-2010 and thus the dispute upon which the Commission issued its opinion was unripe. The Commission's opinion was also an unconstitutional delegation of power.

For all of these reasons, CPS Energy respectfully urges the Court to find that Findings of Fact 84-87 and Conclusions of Law 26 and 27 have no legal effect and remand the case to the Commission with instructions to issue an order consistent with the Court's opinion.

Respectfully submitted,

CPS Energy

HERRERA & BOYLE, PLLC

Gabriel Garcia
ggarcia@cpsenergy.com
Carolyn Shellman
cshellman@cpsenergy.com

Alfred R. Herrera
State Bar No. 09529600
aherrera@herreraboylelaw.com

CPS Energy
145 Navarro
P.O. Box 1771
San Antonio, Texas 78296
(210) 353-5689 (Voice)
(210) 353-6832 (Facsimile)

816 Congress Avenue, Suite 1250
Austin, Texas 78701
(512) 474-1492 (Voice)
(512) 474-2507 (Facsimile)

By: /s/ Alfred R. Herrera
    Alfred R. Herrera

**ATTORNEYS FOR CPS ENERGY**

# CERTIFICATE OF SERVICE

I hereby certify that on this the 8th of May, 2015, a true and correct copy of *Appellant CPS Energy's Post Submission Brief* was served upon all parties listed below by certified mail, return receipt requested, or hand delivered.

By: /s/ Alfred R. Herrera

Alfred R. Herrera

| **Counsel for Public Utility Commission of Texas:**<br><br>Douglas Fraser<br>Megan Neal<br>Office of the Attorney General<br>P.O. Box 12548, Capitol Station<br>Austin, Texas 78711-02548<br>Phone: (512) 463-2012<br>Fax: (512) 457-4610<br>douglas.fraser@texasattorneygeneral.gov<br>megan.neal@texasattorneygeneral.gov | **Counsel for CPS Energy:**<br><br>Alfred R. Herrera<br>HERRERA & BOYLE, PLLC<br>816 Congress Avenue, Suite 1250<br>Austin, TX 78701<br>Phone: (512) 474-1492<br>Fax: (512) 474-2507<br>aherrera@herreraboylelaw.com |
|---|---|
| **Counsel for AT&T Texas:**<br><br>Paul A. Drummond<br>Natalie L. Hall<br>AT&T Legal Department<br>1010 N. St. Mary's, 14th Floor<br>San Antonio, Texas 78215<br>Phone: (210) 351-4830<br>Fax: (210) 886-2127<br>paul.drummond@att.com<br>natalie.hall@att.com | **Counsel for CPS Energy:**<br><br>Carolyn Shellman<br>Gabriel Garcia<br>CPS Energy<br>145 Navarro<br>P.O. Box 1771<br>San Antonio, TX 78296<br>Phone: (210) 353-5689<br>Fax: (210) 353-6832<br>cshellman@cpsenergy.com<br>ggarcia@cpsenergy.com |

| Counsel for AT&T Texas: | Counsel for AT&T Texas: |
|---|---|
| Michael T. Sullivan<br>Mayer Brown LLP<br>71 S. Wacker Drive<br>Chicago, IL  60606<br>Phone:  (312) 782-0600<br>Fax:  (312) 706-8689<br>msullivan@mayerbrown.com | J. David Tate<br>Katherine C. Swaller<br>Thomas Ballo<br>AT&T Legal Department<br>816 Congress Avenue, Suite 1100<br>Austin, Texas 78701<br>Phone:  (512) 457-2304<br>Fax:  (512) 870-3420<br>jon.david.tate@att.com<br>katherine.swaller@att.com<br>thomas.ballo@att.com |
| Counsel for Time Warner Cable Texas LLC: | Counsel for Time Warner Cable Texas LLC: |
| Valerie P. Kirk<br>Melissa Lorber<br>Enoch Kever PLLC<br>600 Congress Avenue, Suite 2800<br>Austin, Texas 78701<br>Phone:  (512) 615-1200<br>Fax:  (512) 615-1198<br>vkirk@enochkever.com<br>mlorber@enochkever.com | J.D. Thomas<br>J. Aaron George<br>Sheppard Mullin Richter & Hampton LLP<br>1300 I Street, N.W.<br>11th Floor East<br>Washington DC  20005<br>Phone:  (202) 218-0000<br>Fax:  (202) w218-0020<br>dthomas@sheppardmullin.com<br>ageorge@sheppardmullin.com |

## CERTIFICATE OF COMPLIANCE

The Word document properties feature states there are 1,961 words in this document.

By: /s/Alfred R. Herrera

Alfred R. Herrera

# APPENDIX I:

## Referenced Case Law and Statutes

*(Excludes Items Provided with CPS Energy's Previous Briefs)*

**No. 03-14-00340-CV**

**APPENDIX I:**

**Referenced Case Law and Statutes**

***(Excludes Items Provided with CPS Energy's Previous Briefs)***

**Cases**

1.  *Brinkley v. Texas Lottery Comm'n*, 986 S.W.2d 767 (Tex. App.—Austin 1999, no pet.)

2.  *City of Waco v. Tex. Nat. Res. Conservation Comm'n*, 83 S.W.3d 169 (Tex. App.—Austin 2002, pet. denied)

3.  *Firemen's Ins. Co. v. Burch,* 442 S.W.2d 331 (Tex. 1969)

4.  *Railroad Comm'n v. CenterPoint Energy Res. Corp.*, 03–13–00533–CV, 2014 WL 4058727, at *2-3 (Tex. App.—Austin, no pet.)

5.  *Robinson v. Parker*, 353 S.W.3d 753 (Tex. 2011)

6.  *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440 (Tex. 1993)

7.  *Trinity Settlement Servs., LLC v. Texas State Secs. Bd.*, 417 S.W.3d 494 (Tex. App.—Austin 2013, pet. denied)

8.  *TXU Electric v. Public Utility Commission*, 51 S.W.3d 275 (Tex. 2001)

**Statutes and Rules**

9.  47 C.F.R. §1.1409(e)

10. TEX. CIV. PRAC. & REM. CODE §§ 37.001–.011

11. TEX. UTIL. CODE ANN. § 54.205

986 S.W.2d 764
Court of Appeals of Texas,
Austin.

Shannon BRINKLEY, d/b/a Krane–Ko Vending,
Appellant,
v.
TEXAS LOTTERY COMMISSION, Appellee.

No. 03–97–00252–CV | Feb. 4, 1999.

Owner of electronic machines similar to slot machines filed action seeking, in part, declaratory judgment that his machines were not gambling devices. The District Court, Travis County, 250th Judicial District, John K. Dietz, J.P., dismissed his causes of action for want of jurisdiction. Owner appealed. The Court of Appeals, John Powers, J. (Retired), held that: (1) cause of action seeking declaratory judgment that machines were not gambling devices sought improper advisory opinion; (2) trial court lacked jurisdiction to grant requested injunctive relief in absence of allegations of probable injury; (3) Commission's advisory letters were not "rules" within meaning of provision of Administrative Procedure Act (APA) authorizing declaratory judgments to determine validity of rules; and (4) Commission was not subject to suit under § 1983 or federal civil rights conspiracy statute.

Affirmed.

**Attorneys and Law Firms**

**\*766** Ira E. Tobolowsky, Tobolowsky & Burk, P.C., Dallas, for Appellant.

John Cornyn, Atty. Gen., Matthew L. Rienstra, Asst. Atty. Gen., Admistrative Law Division, Austin, for Appellee. Before Chief Justice ABOUSSIE, Justices B.A. SMITH and POWERS.[*]

[*] Before John Powers, Senior Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).

**Opinion**

JOHN POWERS, Justice (Retired).

Shannon Brinkley sued the Texas Lottery Commission to obtain a declaratory judgment that certain machines, denominated "eight-liners," are not "gambling devices" as defined by the Texas Penal Code. *See* Tex. Penal Code Ann. § 47.01(B)(4) (West Supp.1998). He applied for an injunction against enforcement of any criminal or administrative penalties for operating "eight-liners," and in a civil-rights action prayed for compensatory damages. The trial court dismissed his causes of action for want of jurisdiction. Brinkley appeals. We will affirm the judgment.

**THE CONTROVERSY**

The Bingo Enabling Act, administered and enforced by the Texas Lottery Commission, provides as follows:

> A game of chance other than bingo ... may not be conducted or allowed during an occasion when bingo is played.... This subsection does not prohibit the exhibition and play of an amusement machine that is not a gambling device as defined by Section 47.01, Penal Code.

Tex.Rev.Civ. Stat. Ann. art. 179d, § 11(k) (West Supp.1998). Section 47.01 of the Penal Code defines "gambling device."[1]

[1] "Gambling device" means any electronic, electromechanical, or mechanical contrivance not excluded under Paragraph (B) that for a consideration affords the player an opportunity to obtain anything of value, the award of which is determined solely or partially by chance, even though accompanied by some skill, whether or not the prize is automatically paid by the contrivance. The term:
* * *
(B) does not include any electronic, electromechanical, or mechanical contrivance designed, made, and adapted solely for bona fide amusement purposes if the contrivance rewards the player exclusively with noncash merchandise prizes, toys, or novelties, or a representation of value redeemable for those items, that have a wholesale value available from a single play of the game or device of not more than 10 times the amount charged to play the game or device once or $5, whichever is less.
Texas Penal Code Ann. § 47.01(4)(B) (West Supp.1998).

The Commission licenses and regulates some 2,500 bingo-parlors. Many licensees allow the operation of "eight-liners" in their parlors. Eight-liners are electronic machines (similar to "slot machines") that dispense gift certificates redeemable for prizes. The machines do not all operate in the same manner; their operation and payout can be configured in a variety of ways.

**\*767** The Commission received numerous complaints and inquiries from licensees who were uncertain about whether the particular machines in their parlors were set up to operate legally. In response, the Commission sent to its licensees letters setting forth criteria by which the licensees might ascertain the legal status of machines in their parlors. The letters included a warning that illegally operated machines exposed licensees to administrative and criminal penalties.[2] The Commission noted in the letters that application of the stated criteria would not necessarily determine the legality of the machines and "the agency cannot guarantee that the use of the eight-liners is necessarily legal." The letters concluded: "we hope this helps answer questions you may have in regard to this issue."

[2]    The Commission may impose administrative penalties for violations of the Bingo Enabling Act. Law-enforcement authorities enforce the Texas Penal Code.

Brinkley does not hold a Commission license to operate a bingo parlor. He owns several eight-liners that he formerly operated in a space he leases within a licensed bingo parlor. When Brinkley's lessor received the Commission's letters, he refused to allow Brinkley to continue the operation of his eight-liners in the bingo parlor.

Brinkley pleaded against the Commission the following causes of action:

(1) An action under the Uniform Declaratory Judgments Act for a judicial determination that eight-liners are not gambling devices under section 47.01(4)(B) of the Texas Penal Code, and that the Commission's interpretation of section 47.01 is unconstitutional;

(2) an action for declaratory judgment under section 2001.038 of the Texas Government Code that the Commission's letters constitute "rules," as defined by section 2001.003(6) of the Administrative Procedure Act, and that the "rules" are invalid because they were not

formulated or adopted in compliance with the rulemaking provisions of Texas Government Code sections 2001.021–.037;[3]

[3]    *See* Tex. Gov't Code Ann. §§ 2001.021–.037 (West 1998).

(3) an application for injunction restraining the Commission and "all others" from interfering with the operation of Brinkley's eight-liners in bingo parlors, whether by raids, harassment, criminal prosecution, forfeiture and seizure of Brinkley's eight-liners, or any other way; and

(4) actions for injunctive relief and compensatory damages, under 42 United States Code sections 1983 and 1985, for violation of Brinkley's civil rights under color of state law.[4]

[4]    *See* 42 U.S.C. §§ 1983, 1985 (1994).

The Commission filed pleas to the jurisdiction, contending the trial court lacked subject-matter jurisdiction because (1) the actions were barred by the doctrine of sovereign immunity; (2) Brinkley lacked standing to assert the actions alleged; (3) the trial court lacked jurisdiction to determine legal relationships under a penal statute; and (4) there existed no justiciable controversy. The trial court denied the plea of sovereign immunity but sustained the pleas on the other grounds claimed and dismissed the actions. Brinkley contends the trial court possessed jurisdiction on the grounds discussed below.

**UNIFORM DECLARATORY JUDGMENTS ACT**

[1] [2] [3] [4] The separation-of-powers doctrine prohibits courts from issuing advisory opinions. *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 444 (Tex.1993); *Firemen's Ins. Co. v. Burch,* 442 S.W.2d 331, 333 (Tex.1969); *Morrow v. Corbin,* 122 Tex. 553, 62 S.W.2d 641, 647 (1933). The distinctive feature of an advisory opinion is that it decides an abstract question of law without binding the parties. *Alabama State Fed'n of Labor v. McAdory,* 325 U.S. 450, 461, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945); *Texas Ass'n of Bus.,* 852 S.W.2d at 444; *Firemen's Ins. Co.,* 442 S.W.2d at 333; *California Prods. Inc. v. Puretex Lemon Juice, Inc.,* 160 Tex. 586, 334 S.W.2d 780, 783 (1960). An opinion is advisory

when the judgment sought would not constitute specific relief to a litigant or affect legal relations. *Reuter v.* **\*768** *Cordes–Hendreks Coiffures,* 422 S.W.2d 193, 196 (Tex.Civ.App.—Houston [14th Dist.] 1967, no writ). "The court will not declare rights on facts which have not arisen or adjudicate matters which are contingent, uncertain, or rest in the future." 26 C.J.S. *Declaratory Judgments,* § 28 (1956).

[5] [6] Brinkley alleged that he sustained "irreparable injury to vested property rights with no adequate remedy at law" because his lessor, "as a result" of the Commission's letters, demanded that Brinkley remove his machines. Elsewhere in his petition, Brinkley's allegations are susceptible of a construction that the letters prevent his operating his machines in other bingo parlors. We believe Brinkley's cause of action under the UDJA requires an advisory opinion. Brinkley and the Commission are the only parties to the lawsuit and Brinkley is not a licensee subject to the Commission's regulation.[5] Brinkley necessarily speculates that a declaratory judgment, holding that eight-liners are not gambling devices, may induce his lessor or other bingo-parlor licensees to allow him to operate his machines, however configured, in their parlors. This is a contingency, an uncertainty, a hypothesis upon which a court may not decide the legal issues raised in Brinkley's petition. *See Coalson v. City Council of Victoria,* 610 S.W.2d 744, 747 (Tex.1980) (suit to declare invalid city charter-amendment initiative requires advisory opinion because voters might disapprove proposed amendment); *Central Sur. & Ins. Corp. v. Anderson,* 445 S.W.2d 514, 515 (Tex.1969) (suit for declaratory judgment that insurer liable to pay judgment, in advance of judgment against tort defendant, requires advisory opinion); *see generally Texas Ass'n of Bus.,* 852 S.W.2d at 444.[6]

[5]     The Commission regulates amusement machines pursuant to article 179d of the Texas Revised Civil Statutes (Bingo Enabling Act) which is concerned only with those amusement machines located in bingo halls. *See* Tex.Rev.Civ. Stat. art. 179d (West 1998). Outside of bingo halls, law enforcement personnel are charged with the enforcement of Texas Penal Code section 47.01 which prohibits the use of "gambling devices." Tex. Penal Code § 47.01 (West 1994 & Supp.1998).

[6]     The Uniform Declaratory Judgments Act, found in the Texas Civil Practice & Remedies Code, is a procedural device for deciding cases already within a court's jurisdiction; the statute does not enlarge a court's jurisdiction so as to authorize the rendition of advisory opinions. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 37.001–.011 (West 1997); *Texas Ass'n of Bus. v. Texas*

*Air Control Bd.*, 852 S.W.2d 440, 444 (Tex.1993).

## INJUNCTIVE RELIEF

[7] [8] The trial court also lacked jurisdiction to grant the injunctive relief requested.[7] Injunctions may not issue unless it is shown that the respondent will engage in or is engaging in the activity to be enjoined. *See State v. Morales,* 869 S.W.2d 941, 946–47 (Tex.1994). Brinkley seeks to enjoin the Commission and "all others" from interfering with the operation of his eight-liners in bingo parlors in any way, including the prohibition of raids, harassment, criminal prosecution, and forfeiture and seizure of his machines. Brinkley alleged only that the Commission sent the advisory letters to about 2,500 licensees. He has not alleged that the Commission threatens to impose upon him (he is not a licensee) administrative penalties nor that law enforcement authorities (not parties here) threaten to prosecute him under the criminal law. He has not alleged that the Commission, unless restrained, will enforce against him any sanction within its power to enforce. We decline to hold as a matter of law that the Commission's sending of the advisory letters to a large number of its licensees constituted a showing of "probable injury" to Brinkley. *See id.* at 946–47; *Transport Co. v. Robertson Transports, Inc.,* 152 Tex. 551, 261 S.W.2d 549, 552 (1953) (requiring showing of "probable injury" if respondent not restrained). Absent allegations of fact showing a probable injury, a court is *without jurisdiction* to grant the injunctive relief requested. *See Morales,* 869 S.W.2d at 942, 946–47; *see also* **\*769** *Texas Employment Comm'n v. Martinez,* 545 S.W.2d 876, 877–78 (Tex.Civ.App.—El Paso 1976, no writ).

[7]     Brinkley requested injunctive relief pursuant to section 65.011 of the Texas Civil Practice & Remedies Code and section 16.29 of the Texas Business & Commerce Code (Injury to Business Reputation or Trade Name or Mark); Tex. Civ. Prac. & Rem.Code Ann. § 65.011 (West 1997); Tex. Bus. & Com.Code Ann. § 16.29 (West Supp.1998).

## ADMINISTRATIVE PROCEDURE ACT—DECLARATORY JUDGMENT

Section 2001.038 of the Administrative Procedure Act

(APA) creates a cause of action for declaratory judgment to determine the validity or applicability of an agency rule when it "is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff." Tex. Gov't Code Ann. § 2001.038 (West 1998). For purposes of section 2001.038 and all other sections in Chapter 2001 of the Texas Government Code, the word "rule"

> (A) means a state agency statement of general applicability that:
>
> (i) implements, interprets, or prescribes *law* or *policy;* or
>
> (ii) describes the procedure or practice *requirements* of a state agency;
>
> (B) includes the amendment or repeal of a prior rule; and
>
> (C) does *not* include a statement regarding only the internal management or organization of a state agency and *not affecting private rights or procedures.*

Tex. Gov't Code Ann. § 2001.003(6) (West 1998) (emphasis added).

[9] Brinkley contends the trial court had jurisdiction of his cause of action for declaratory judgment, under section 2001.038 of the APA, because the Commission letters amounted to a "rule" as defined in section 2001.003(6). We disagree.

[10] "Not every statement by an administrative agency is a rule for which the APA prescribes procedures for adoption and for judicial review." *Texas Educ. Agency v. Leeper,* 893 S.W.2d 432, 443 (Tex.1994). This observation refers to the fact that administrative agencies routinely issue letters, guidelines, and reports, and occasionally file briefs in court proceedings, any of which might contain statements that intrinsically implement, interpret, or prescribe law, policy, or procedure or practice requirements. Are all such statements therefore "rules" within the meaning of APA section 2001.003(6) and 2001.038? They are not for several reasons.

It does not appear that the legislature has delegated to the Commission a power to bind others by ukase—a naked proclamation contained, for example, in a letter, a set of guidelines, or a report, or by a statement in a brief filed in a court proceeding. It appears instead that the Commission may bind others generally only by a *rule*

promulgated through the notice-and-comment procedures of APA sections 2001.022–.037, or bind particular litigants by the Commission's *order* adjudicating a contested case conducted under the procedures set forth in APA sections 2001.051–.147. The same is true in general of most constitutive statutes and enabling acts delegating power to administrative agencies.

The legislature intends that administrative agencies exercise effectively the powers delegated to them. *See Sexton v. Mount Olivet Cemetery Ass'n,* 720 S.W.2d 129, 137 (Tex.App.—Austin 1986, writ ref'd n.r.e.). Agencies would be reduced to impotence, however, if bound to express their views as to "law," "policy," and procedural "requirements" through contested-case decisions or formal rules exclusively; and they could not under such a theory exercise powers explicitly delegated to them by the legislature. How, under such a theory, could an agency practically express its views to an informal conference or advisory committee, or state its reasons for denying a petition to adopt a rule, or file a brief in a court or agency proceeding? *See* Tex. Gov't Code Ann. §§ 2001.021, .031, .058 (West 1998).

The foregoing are only examples derived from the APA itself. If every expression by the agency as to "law," "policy," and procedural "requirements" requires the promulgation of a formal rule, the agency could no longer exercise its "informed discretion" to choose adjudication as a means of making law and policy, rather than rulemaking, a choice we have repeatedly said an agency has when it possesses both adjudicatory and rulemaking powers. *See, e.g., Madden v. Texas Bd. of Chiropractic Exmr's,* 663 S.W.2d 622, 626 (Tex.App.—Austin 1984, writ ref'd n.r.e.); **\*770** *State Bd. of Ins. v. Deffebach,* 631 S.W.2d 794, 799 (Tex.App.—Austin 1982, writ ref'd n.r.e.). If the agencies were so restricted, they would be deprived, as a practical matter, of the power to adjudicate; an agency could make valid "law" or "policy" only through the straight-jacket of rulemaking, even though the agency might be quite unable to do so for any number of reasons as noted in *El Paso v. Public Util. Comm'n,* 883 S.W.2d 179, 188–89 (Tex.1994).[8]

---

[8]  The legislature may, by statute, require an agency to make formal rules with regard to particular matters. *See Railroad Comm'n v. Shell Oil Co.,* 146 Tex. 286, 206 S.W.2d 235, 241 (1947). The agency would be bound, of course, to enact rules in compliance with the legislative mandate. It may also be that a constitutional provision requires, in particular circumstances, that the agency promulgate a formal rule before attempting to bind private persons by the agency's view of "law," "policy," or procedural "requirements." *See, e.g., Madden v. Texas Bd. of Chiropractic Exmr's,* 663

S.W.2d 622, 626–27 (Tex.App.—Austin 1984, writ ref'd n.r.e.). Such matters are not involved in the present controversy.

The very text of the APA rejects the theory that every agency pronouncement regarding "law," "policy," and procedural "requirements" requires the promulgation of a formal rule. That theory would destroy, for example, the distinction between "rules" and "policies" found in section 2001.058(b), (c), and (e); the word "policies" is rendered meaningless because under that theory "policies" could *only* exist in the form of "rules."

We need not belabor the point. The definition in section 2001.003(6) is sufficiently flexible to allow agencies to perform their functions without unnecessary procedural obstacles; the definition expressly excludes from the definition of a "rule" any agency statements regarding only the internal management or organization of an agency that *do not affect* private rights or procedures. *See* Tex. Gov't Code Ann. § 2001.003(6)(C) (West 1998). This statutory exclusion encompasses any agency statement regarding "law," "policy," or procedural "requirements" made outside the rulemaking and contested-case context; such statements have no legal effect on private persons absent a statute that so provides or some attempt by the agency to enforce its statement against a private person, as in *Madden* where the agency attempted to enforce, in the course of adjudicating a contested case, its policy of what constituted a "bona fide reputable chiropractic" school. *See Madden,* 663 S.W.2d at 626–27. At that point, an affected person may challenge, if he wishes, the validity or applicability of the agency statement on whatever grounds may be applicable. Until then, the agency's pronouncements regarding "law," "policy," and procedural "requirements" remain merely informal views, effective only upon and within the agency's internal management and organization.[9] *See Leeper,* 893 S.W.2d at 443 (state board of education resolution stating guidelines for school districts pending statutory revision); *United Parcel Serv., Inc. v. Oregon Transp. Comm'n,* 27 Or.App. 147, 555 P.2d 778, 780 (1976) (commission statement consenting to city's designation of truck route); *Reynolds Sch. Dist. v. Oregon Sch. Employees,* 58 Or.App. 609, 650 P.2d 119, 123 (1982) (agency statement made in adjudication of previous contested case); *United States v. Fitch Oil Co.,* 676 F.2d 673, 678 (Temp.Emer.Ct.App.U.S.1982) (statement of Secretary of Energy); *Durnin v. Allentown Fed. Sav. and Loan Ass'n,* 218 F.Supp. 716, 721 (E.D.Pa.1963) (letter from supervisory agent of Federal Home Loan Bank Board); 1 Davis and Pierce, *Administrative **\*771** Law Treatise* § 3.5 at 120 (3d

ed.1994).[10]

[9] The letters sent by the Commission in this instance were, on their face, simply advisory guidelines; they did not purport to express a final opinion on the legality of eight-liners of any particular kind. We have previously noted the valuable role such advisory opinions serve in administration. *See Texas Comm'n of Licensing and Regulation v. Model Search America, Inc.,* 953 S.W.2d 289 (Tex.App.—Austin 1997, no writ). As we stated in that opinion,

[T]o permit suits for declaratory judgments upon mere informal, advisory, administrative opinions might well discourage the practice of giving such opinions, with a net loss of far greater proportions than any possible gain.

*Id.* at 293 quoting, *Helco Prods. Co. v. McNutt,* 137 F.2d 681, 684 (D.C.Cir.1943). Considering the number of bingo-parlor licensees and the variety of ways in which eight-liners can be configured, the practical value of the letters is obvious. Nothing in the letters purports to foreclose an individual licensee from seeking, if he wishes, a formal opinion from the Commission regarding particular eight-liners. While private parties may voluntarily comply with such guidelines, they are not legally bound to do so.

[10] The first Commission letter stated:

TO ALL BINGO LICENSEES:

The Texas Lottery Commission has received complaints regarding the use of gambling devices at locations where bingo is being conducted. The specific complaints concern the operation of devices popularly known as "Eight Liners."

The Texas Lottery Commission considers these devices to be gambling devices as defined by Section 47.01(4) of the Texas Penal Code, *as a result of the method of operation and payoff of these devices.*

Please be aware that Section (11(k)) of the Bingo Enabling Act, Texas Revised Civil Statutes Article 179d, provides the following: "A game of chance other than bingo may not be conducted or allowed during an occasion when bingo is played. This subsection does not prohibit the exhibition and play of an amusement machine that is not a gambling device as defined by Section 47.01, Penal Code."

Therefore, effective September 1, 1996, the Commission will refer *any incident of use* by a licensee of the aforementioned device(s) *in an illegal manner* which is detected after September 1, 1996 to the appropriate law enforcement agency for criminal prosecution and will initiate an appropriate administrative disciplinary action.

This notice is intended to *make licensees aware* of the agency's position and to *afford an opportunity* to licensees for voluntary compliance.

**83 S.W.3d 169**
**Court of Appeals of Texas,**
**Austin.**

**CITY OF WACO, Appellant,**
**v.**
**TEXAS NATURAL RESOURCE CONSERVATION**
**COMMISSION; and Jeffrey A. Saitas, as Executive**
**Director, Appellees.**

No. 03–01–00217–CV. | May 9, 2002. | As Modified
on Overruling of RehearingJune 21, 2002.

City and dairy producers' association filed action seeking
declaratory judgment that Texas Natural Resources
Conservation Commission (TNRCC) order regulating
future permits for confined animal feeding operations
(CAFOs) was invalid, TNRCC withdrew order and filed
motion to dismiss action as moot and not ripe, and city
amended petition to seek declaratory relief that TNRCC's
interim policy of continuing to issue any permits violated
state regulation. The 353rd Judicial District Court, Travis
County, Paul Davis, J., dismissed actions. City appealed.
The Court of Appeals, Bea Ann Smith, J., held that: (1)
dispute had to be evaluated in terms of ripeness, not
mootness; (2) question of whether federal regulation, as
adopted by state law, operated to prohibit TNRCC from
approving any new CAFO permits until TNRCC adopted
necessary pollution-reduction measures presented purely
legal inquiry, which would not benefit from development
of additional facts in connection with specific permit
application; and (3) facts underlying dispute were
sufficiently developed to make dispute ripe for review;
and on rehearing, Smith, J., held that: (4) sovereign
immunity did not bar city's suit; and (5) city was not
seeking advisory opinion, and thus suit was not
hypothetical and presented real controversy that would be
resolved by declaratory relief sought.

Reversed and remanded.

**Attorneys and Law Firms**

**\*172** Jackson B. Battle, Brown McCarroll L.L.P., Austin,
for appellant.

Anthony C. Grigsby, Linda B. Secord, Assistant
Attorneys General, Natural Resources Division, Austin,
for appellees.

Before Chief Justice ABOUSSIE, Justices B.A. SMITH

and PURYEAR.

**BEA ANN SMITH**, Justice.

This appeal concerns whether a dispute about the Texas
Natural Resource Conservation Commission's (the
TNRCC's) permit-issuing process is ripe for judicial
review by the district court. The Bosque River, a tributary
of the Brazos River, is located northwest of the city of
Waco. Segments 1226 and 1255 of the North Bosque
River have been listed as having impaired water quality
due to high levels of nutrients. *See* 30 Tex. Admin. Code
§§ 307.1–.10 (2001) (Tex. Natural Res. Conservation
Comm'n, Tex. Surface Water Quality Standards). Near its
point of confluence with the Brazos River, the Bosque
River forms Lake Waco, which provides the sole source
of drinking water for approximately 150,000 people in
and around Waco; the lake is also used extensively for
recreational activities. The water quality of Lake Waco,
which is a "sink" for any dissolved pollutants in the
Bosque River, has been affected. Numerous dairy
operations are located northwest of Waco in Erath County
in the Bosque River watershed. The dairies must seek
confined animal feeding operation (CAFO) permits from
the TNRCC because the agricultural waste from their
operations, which becomes dissolved in runoff or is
otherwise discharged, ultimately discharges into the river.

[1] This dispute arose when the TNRCC promulgated an
order in February 2000 regulating future permits for
CAFOs. Both the City of Waco (the City) and the Texas
Association of Dairymen (the Dairymen) filed actions for
declaratory judgments attacking the order. The TNRCC
responded by withdrawing the order and moving to
dismiss both actions as moot and not ripe. The City
amended its petition to seek declaratory relief that the
TNRCC's interim policy of continuing to issue any
permits violates state regulations. The district court
dismissed the actions. Both the Dairymen and the City
appealed the dismissal of their suits for declaratory relief.
However, following oral argument, the Dairymen
voluntarily dismissed their appeal.[1] The only remaining
issue before us is the ripeness of the City's suit for
declaratory relief.[2]

[1]     The TNRCC filed a motion to dismiss the Dairymen's
appeal on the ground that legislative action had mooted
the association's appeal. Because the Dairymen
voluntarily dismissed their appeal, we overrule the
TNRCC's motion.

[2] The TNRCC's motion to dismiss the Dairymen's and the City's claims asserted mootness and ripeness grounds. After a hearing, the trial court granted the motion. The order states that "[a]fter considering the motion, the responses, and the evidence filed in support of the motion and responses, the court: GRANTS the motion and DISMISSES [the consolidated causes]." In its brief, the TNRCC asserts that the City's claims is moot *and* not ripe. While the City's original claims may have been rendered moot by the TNRCC's action revoking its order, it amended its petition to state a different claim based on the TNRCC's policy. We conclude therefore that the issue should be analyzed in terms of ripeness.

Specifically, the City seeks a declaration that the TNRCC may not grant any additional **\*173** permits for CAFOs in the Bosque River watershed until it complies with certain federal regulations that have been incorporated into state law. *See* 30 Tex. Admin. Code § 305.538 (1999) (Tex. Natural Res. Conservation Comm'n, Prohibitions for TPDES Permits) ("no permit may be issued under the conditions prohibited in 40 Code of Federal Regulations § 122.4, as amended"). The City maintains that it seeks resolution of a pure question of law: whether section 122.4(i) operates to bar *all* new permits until the TNRCC has developed an implementation scheme to reduce pollution in the two impaired segments of the Bosque River. The TNRCC contends that its compliance with the regulations can only be determined in the context of a permit application on the facts presented by a particular application. Because we agree with the City that its request for declaratory relief presents a determination of law, we reverse the district court's order of dismissal and remand this cause for consideration on the merits.

## FACTUAL AND PROCEDURAL BACKGROUND

During the 1980s, the dairy industry expanded greatly in the North Bosque River watershed. Erath County became the leading county in the state for milk production. This reflects a trend in the dairy industry away from small, geographically scattered dairies toward large-scale, clustered dairy operations. In early 2001, the TNRCC estimated that there were 41,000 milk cows concentrated along the Bosque River watershed. The waste produced by these concentrated operations has impaired the water quality of the adjacent stretches of the North Bosque River. The TNRCC has identified the primary source of the pollution to be phosphorus, which is a nutrient found in animal waste. The large amounts of phosphorus in the

water have caused excessive growth of algae and other aquatic plants, which in turn potentially cause distaste and odor in drinking water and, under certain circumstances, contribute to the depletion of dissolved oxygen.

Under the federal Clean Water Act, a state is required to "identify those waters within its boundaries for which the effluent limitations required by [the Act] are not stringent enough to implement any water quality standard applicable to such waters." 33 U.S.C. § 1313(d)(1)(A) (2001). In 1998, the TNRCC listed two segments of the Bosque River as "impaired under narrative water quality standards related to nutrients and aquatic plant growth." Once the TNRCC identified the water segments as impaired, it was required to develop a Total Maximum Daily Load (TMDL), which is a plan for assimilation of the pollutants that are present in the water. *See id.* § 1313(d)(1)(C).[3] The TNRCC describes a TMDL as

[3] Under the Clean Water Act, the TNRCC is also required to develop a "continuing planning process" for reducing the pollution and bringing the water segments up to state water quality standards for nutrients and pathogens. *See* 33 U.S.C. § 1313(e) (2001). This process must include, in part, plans for "effluent limitations and schedules of compliance at least as stringent as those [required under provisions of the Clean Water Act]," "the incorporation of all elements of any applicable area-wide waste management plans," total maximum daily loads for pollutants in accordance with subsection (d), and "adequate implementation, including schedules of compliance, for revised or new water quality standards." *Id.*

a quantitative plan that determines the amount of a particular pollutant that a water body can receive and still meet its applicable water quality standards. In other words, TMDLs are the best possible estimates of the assimilative capacity of the water body for a pollutant under **\*174** consideration. A TMDL is commonly expressed as a load, with units of mass per time period, but may be expressed in other ways also. TMDLs must also estimate how much the pollutant load needs to be reduced from current levels in order to achieve water quality standards.

More than three years after the TNRCC identified the watershed as impaired, the TNRCC had still not established a TMDL plan. Although the agency "anticipated" in late 1999 that it would be able to submit a proposed TMDL to the Environmental Protection Agency (EPA) by the spring of 2000, the TNRCC did not complete a TMDL until early 2001. The TNRCC has now sent a TMDL to the EPA for

approval; at the time the parties submitted their briefs in this cause, however, the TMDL had not been approved by that agency.

The TMDL confirms that a major controllable source of the phosphorus in the water comes from the dairy farms concentrated in the watershed. It recommends that forty to sixty percent reductions in phosphorus loadings in some areas and fifty percent overall will be needed to reduce the potential for problematic algae growth. The City notes various problems with the proposed TMDL. The City argues that its recommendations are based on now outdated information; the number of permits currently pending with the TNRCC, if approved, would increase the number of authorized cows by 20,000, so the previously recommended levels of the TMDL will not achieve attainment of water quality standards.[4] In addition, the TMDL does not establish the amount of phosphorus loadings, allocated among the dairies and other dischargers, that could be tolerated without violating water quality standards for pathogens and nutrients. Nor does it implement compliance schedules for the dairies and other dischargers to reduce the pathogens in the two impaired water segments.

[4]    The TMDLs are based on data that was collected during the mid–1990s. The TNRCC has noted similar concerns with the reliability of the data. An interagency memo states that the TMDL's "demonstration of feasibility is based in large part on computer model simulations that estimated the amount of dairy waste to be applied and otherwise disposed of based on the number of dairy cows existing or permitted in the watershed. If the waste projection changes significantly due [to] increasing number of animals, the model numbers are less useful for supporting TMDL approval."

Compounding these failures with respect to existing dischargers, the City asserts that the TNRCC has worsened the situation by approving new applications for additional discharges of waste into the already polluted river. With the exception of certain small operations, the dairies in the watershed are required to obtain CAFO permits from the TNRCC that allow them to discharge waste from their operations. The City asserts that since declaring the segments impaired, the TNRCC has continued to grant permits for new and expanded uses under an evolving "interim policy." Although this interim policy has taken slightly different forms in recent years, the City asserts that every phase of the policy grants the agency the discretion to issue new permits, contrary to the regulations prohibiting additional CAFOs until the TNRCC implements measures that will improve the water quality to meet state standards.

The Executive Director of the TNRCC testified that the agency will exercise its discretion to grant new permits as long as the additional discharge will not worsen the "environmental status quo" of the impaired river. The agency also points to a rule that it says embodies this policy. *See* 30 Tex. Admin. Code § 321.33 (2001) **\*175** (Tex. Natural Res. Conservation Comm'n, Confined Animal Feeding Operations, Applicability).[5] The City argues that the TNRCC's current discretionary policy is at odds with state law which requires that a sufficient allocation be available for the water to receive the additional loading and still meet state water quality standards. *See id.* § 305.538 (1999) (prohibiting permit that would violate 40 C.F.R. § 122.4). The City sought a declaration that

[5]    The current administrative code is cited for convenience.

until the TNRCC promulgates legally binding regulations to implement TMDLs for nutrients and pathogens in the two Bosque Segments that contain load allocations and other measures that will assure compliance with the state water quality standards, no permit may be issued to construct or operate a new CAFO ... within the watershed.

The TNRCC argues that the City's suit would not be ripe until the TNRCC issued a specific permit. The district court agreed with TNRCC and dismissed the suit. The City now appeals from that judgment.

## DISCUSSION

[2] [3] [4] [5] Ripeness implicates subject-matter jurisdiction and emphasizes the requirement of a concrete injury in order to present a justiciable claim. *Waco Indep. Sch. Dist. v. Gibson,* 22 S.W.3d 849, 851 (Tex.2000); *Patterson v. Planned Parenthood,* 971 S.W.2d 439, 442 (Tex.1998). Ripeness is concerned with when an action can be brought and seeks to conserve judicial time and resources for real and current controversies rather than hypothetical or remote disputes. *Gibson,* 22 S.W.3d at 851; *Patterson,* 971 S.W.2d at 442–43. Courts of this state may not issue advisory opinions. *Patterson,* 971 S.W.2d at 443; *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 444 (Tex.1993). An opinion issued in a case that is not ripe would address only a hypothetical injury rather than remedying actual or imminent harm. *See Texas Ass'n of Bus.,* 852 S.W.2d at 444.

[6] [7] [8] In determining whether a cause is ripe for judicial consideration, we look to see whether the facts have sufficiently developed to show that an injury has occurred, or is likely to occur. *Patterson,* 971 S.W.2d at 442. A claimant is not required to show that the injury has already occurred, provided the injury is imminent or sufficiently likely. *Gibson,* 22 S.W.3d at 852; *Patterson,* 971 S.W.2d at 442. Likewise, a person seeking a declaratory judgment need not have incurred actual injury; a declaratory judgment action will lie if the facts show the presence of "ripening seeds of a controversy." *Texas Dep't of Banking v. Mount Olivet Cemetery Ass'n,* 27 S.W.3d 276, 282 (Tex.App.-Austin 2000, pet. denied) (quoting *Texas Dep't of Pub. Safety v. Moore,* 985 S.W.2d 149, 153–54 (Tex.App.-Austin 1998, no pet.)).

[9] The City contends that its claim that section 122.4(i) of the Code of Federal Regulations, which has been incorporated into state law, prohibits the TNRCC from issuing permits for new[6] CAFOs in the watershed until the TNRCC develops compliance schedules and pollutant load allocations is ripe. Section 122.4(i) reads:

[6]     A CAFO that currently operates under a permit may also seek a permit for additional or expanded uses. Section 122.4(i) applies only to a permit for a new source or discharger. *See* 40 C.F.R. § 122.4(i) (2001). Therefore, the City has stipulated that its appeal is limited to permits for new CAFOS.

No permit may be issued [t]o a new source or a new discharger, if the discharge from its construction or operation **\*176** will cause or contribute to the violation of water quality standards. The owner or operator of a new source or new discharger proposing to discharge into a water segment which does not meet applicable water quality standards or is not expected to meet those standards even after the application of the effluent limitations required by sections 301(b)(1)(A) and 301(b)(1)(B) of CWA, *and for which the State or interstate agency has performed a pollutants load allocation for the pollutant to be discharged,* must demonstrate, before the close of the public comment period, that:

  (1) *There are sufficient remaining pollutant load allocations to allow for the discharge;* and

  (2) *The existing dischargers into that segment are subject to compliance schedules designed to bring the segment into compliance with applicable water quality standards.* The Director may waive the submission of information by the new source or

new discharger required by paragraph (i) of this section if the Director determines that the Director already has adequate information to evaluate the request. An explanation of the development of limitations to meet the criteria of this paragraph (i)(2) is to be included in the fact sheet to the permit under § 124.56(b)(1) of this chapter.

40 C.F.R. § 122.4(i) (2001) (Envtl. Prot. Agency, Nat'l Pollutant Discharge Elimination Sys., Prohibitions) (emphasis added). The City interprets section 122.4(i) to mean that "no discharge permit may be issued to a new CAFO within the impaired watershed until the TNRCC promulgates regulations to implement TMDLs for phosphorous and pathogens in the two Bosque Segments that contain load allocations and compliance schedules."

Under the TNRCC's interpretation, section 122.4(i) does not obligate the agency to develop load allocations and compliance schedules before it issues a new discharge permit; rather, it merely limits the TNRCC's ability to issue permits that would "cause or contribute to the violation of water quality standards." Whether a new permit will cause or contribute to the violation of water quality standards, the agency continues, depends on the specific conditions and terms of a given permit. The TNRCC argues that the City's claim does not present a pure question of law because the agency's compliance with section 122.4(i) can only be determined in the context of an application for a permit. Thus, according to the TNRCC, the City's claim is not ripe until the agency approves a permit, because only at that point can one determine whether the permit will cause or contribute to a violation of water standards. The agency also emphasizes that variations between state and federal law affect whether a particular permit violates section 122.4(i).

The City responds that the particular conditions of any permit are irrelevant because under the agency's rules and policy, every new permit to discharge into impaired waters violates section 122.4(i). The City points to the rules governing CAFOs,[7] which specifically authorize discharges in "chronic or catastrophic rainfall events." *See* 30 Tex. Admin. Code §§ 321.31(b), .32(8), .34, .39(f)(19)(E) (2001) (Tex. Natural Res. Conservation Comm'n, Concentrated Animal Feeding Operations). **\*177** The City also maintains that the TNRCC's own evidence indicates that only about half of the waste produced by CAFOs is ever "collectible." Even if all of the "collectible waste" is prevented from entering the watershed, other uncollectible waste is not. Therefore, issuing an additional permit without pollutant load allocations and compliance schedules will violate section 122.4(i), regardless of the conditions that are imposed. Furthermore, according to the City, differences between

state and federal law are not relevant to its declaratory judgment suit, which is premised solely on the basis of state law. The City notes that section 122.4(i) has been incorporated into and become part of state law, and that its claim is based on the TNRCC's failure to implement standards to comply with state, not federal, water quality standards.

[7] These are the rules that currently govern the CAFO permit process. *See* Tex. Water Code Ann. § 26.503(b)(1) (West Supp.2002) (stating that an individual permit must "provide for management and disposal of waste in accordance with Subchapter B, Chapter 321, Title 30, Texas Administrative Code").

[10] We conclude that the question of whether section 122.4(i) operates to prohibit the TNRCC from approving any new discharge permits until it adopts the necessary pollution-reduction measures presents a purely legal inquiry. In determining ripeness, courts should examine (1) the fitness of the issues for judicial decision, and (2) the hardship occasioned to a party by the court's denying judicial review. *Office of Pub. Util. Counsel v. Public Util. Comm'n,* 843 S.W.2d 718, 724 (Tex.App.-Austin 1992, writ denied). The City's claim poses a purely legal question-the interpretation of section 122.4(i)-which will not benefit from the development of additional facts in connection with a specific permit application. The TNRCC asserts that the issues are not fit for decision because the City has failed to challenge a final agency action. Citing provisions in the Water Code and the Administrative Procedure Act (APA), the TNRCC emphasizes that judicial review is limited to agency rulings, orders, decisions, or other acts, or the validity or applicability of a rule. *See* Tex. Water Code Ann. § 5.351 (West 2000); Tex. Gov't Code Ann. § 2001.038 (West 2000).

[11] [12] The City, however, has asserted a different basis for its lawsuit, specifically, sections 37.002–.004 of the Uniform Declaratory Judgments Act (UDJA). *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 37.002–.004 (West 1997). Under that Act, a claimant's access to judicial review is not limited to review of agency rules; instead, the Act provides a basis by which a claimant can obtain a declaration of rights, status, or other legal relations under a writing or a statute. *See id.* § 37.004. A suit under the UDJA is not confined to cases in which the parties have a cause of action apart from the Act itself. *Texas Dep't of Pub. Safety v. Moore,* 985 S.W.2d 149, 153 (Tex.App.-Austin 1998, no pet.). The legislature intended the UDJA to be remedial, to settle and afford relief from uncertainty and insecurity with respect to rights, and to be liberally construed. Tex. Civ. Prac. & Rem.Code Ann. § 37.002; *Moore,* 985 S.W.2d at 153.

[13] The TNRCC also questions the fitness of the issues for decision, asserting that the City's request will affect additional parties who are not present to defend their interests. The City responds that it is questionable that any such additional parties would have adequate standing to participate in a challenge to an individual permit. Furthermore, the TNRCC's assertion does not go directly to the ripeness inquiry, which determines *when* an action may be brought, that is, "whether the facts have developed sufficiently so that an injury has occurred or is likely to occur, rather than being contingent or remote." *See Patterson,* 971 S.W.2d at 442. The facts have sufficiently developed as between the TNRCC and the City such that the dispute is not hypothetical. In addition, an interested **\*178** party may intervene in the proceedings on remand. *See* Tex.R. Civ. P. 60.

Moreover, the denial of judicial review will result in hardship to the City. Under the APA, a permit issued in a contested case is final, even while an appeal is pending. *See* Tex. Gov't Code Ann. § 2001.144. The effect of forcing the City to wait until the TNRCC has granted another permit means, in effect, that Lake Waco could become more polluted with the additional discharge while the parties litigate their dispute. Moreover, the City could suffer multiple harms from multiple additional CAFOs, and be forced to make this same legal argument in numerous appeals. Thus, the City's claim satisfies both prongs of the ripeness inquiry.

Furthermore, the City's claim is appropriately brought pursuant to the Declaratory Judgment Act. Under that act, a claimant must show that (1) a justiciable controversy exists as to the rights and status of the parties; and (2) the controversy will be resolved by the declaration sought. *Moore,* 985 S.W.2d at 153. There is a justiciable controversy between the parties regarding the effect of section 122.4(i) on the agency's permitting process. The City asserts that the TNRCC has a duty to improve the water quality of the impaired river segments without further delay, and that the agency has no discretion to issue new CAFO permits until it takes these affirmative steps. The TNRCC responds that it has the discretion to grant additional permits that do not worsen the environmental status quo. A declaration regarding the effect of section 122.4(i) on the agency's authority to issue new CAFO permits will resolve this controversy. Therefore, we hold that the trial court had jurisdiction to hear the City's claim under the UDJA and that the issue is ripe for adjudication.[8]

442 S.W.2d 331
Supreme Court of Texas.

FIREMEN'S INSURANCE COMPANY OF
NEWARK, NEW JERSEY, Petitioner,
v.
Jesse L. BURCH et ux., Respondents.

No. B—914. | Oct. 9, 1968. | Rehearing Denied Oct.
30, 1968. | Second Rehearing Denied and Dissenting
Opinion Jan. 22, 1969.

Suit for declaratory judgment to determine liability of insurer of automobile. The 53rd District Court, Travis County, Jones, J., rendered judgment that insurer was obligated to defend defendant husband of driver and since husband was responsible for torts of wife was obligated to pay any judgment rendered against him, and insurer appealed. The Austin Court of Appeals, Third Supreme Judicial District, 426 S.W.2d 306, affirmed District Court judgment and insurer brought error. The Supreme Court, Norvell, J., held that whether insurer had duty to defend defendant husband of driver was justiciable issue but that District Court had no power to render advisory opinion on hypothetical question of whether insured was liable for wife's torts before it had been established that she was liable to plaintiff.

Affirmed in part and reversed in part.

Smith, J., dissented on Motion for Rehearing.

**Attorneys and Law Firms**

**\*332** Small, Herring, Craig, Werkenthin & Shannon, C. C. Small, Jr., Charles Herring and Bob E. Shannon, Austin, for petitioner.

Garey, Colbert & Kidd, Joe Colbert, Austin, for respondents.

**Opinion**

NORVELL, Justice.

On December 1, 1965, Dorothy Burch was injured in a collision between the car in which she was riding and an automobile driven by Sarah Buttler, the wife of Larry Buttler. Dorothy Burch and her husband, Jesse L. Burch, sued Sarah and Larry Buttler for damages and this action

has not been determined. On December 7, 1966, Jesse L. and Dorothy Burch filed this suit in the form of a declaratory judgment against Firemen's Insurance Company of Newark, New Jersey. The insurance company filed a cross-action and the trial court entered a declaratory judgment decreeing that:

> '(T)he defendant Firemen's Insurance Company of Newark, New Jersey, is obligated by virtue of its Policy No. AFT 322361 to defend Larry J. Buttler in Cause No. 152,097 styled Dorothy M. Burch, et vir v. Sarah C. Buttler, et vir, in the 53rd Judicial District Court of Travis County, Texas, and that since Larry J. Buttler is liable for the torts of his wife, Sarah C. Buttler, committed during their marriage, the defendant, Firemen's Insurance Company of Newark, New Jersey, is obligated by virtue of Policy No. AFT 322361 to pay on behalf of Larry J. Buttler any judgment rendered against him in said Cause No. 152,097 to the full extent of its policy coverage, * * *.'

The court also declared that the insurance company was not obligated to defend Sarah C. Buttler[1] and was 'not obligated to pay any judgment rendered against her' in the case of Burch v. Buttler. This declaratory judgment was affirmed by the Court of Civil Appeals. 426 S.W.2d 306.

[1] Larry Buttler and Sarah Buttler have been divorced and at the time of the rendition of judgment in this cause, May 10, 1967, Sarah was the wife of Hilton Cromier. She will, however, be referred to herein as Sarah Buttler.

[1] The question of the insurance company's duty to defend presented a justiciable issue. No complaint is made of the trial court's disposition of this issue and that portion of the trial court's judgment relating thereto will not be disturbed. However, that portion of the decree which attempts to declare the liability of the insurance company upon any judgment **\*333** which may hereafter be rendered in the case of Burch v. Buttler is purely advisory in nature and beyond the power and jurisdiction of the district court to render. Accordingly, such portion of the trial court's judgment is vacated.

[2] [3] [4] This court has repeatedly held that under our Constitution, the judicial power does not embrace the

giving of advisory opinions. Morrow v. Corbin, 122 tex. 553, 62 S.W.2d 641 (1933); California Products, Inc. v. Puretex Lemon Juice, Inc., 160 Tex. 586, 334 S.W.2d 780 (1960); United Services Life Insurance Co. v. Delaney, 396 S.W.2d 855 (Tex.Sup.1965), and authorities therein cited. Article 5, s 8 of the Texas Constitution, Vernon's Ann.St. does not empower the district courts to render such opinions and as jurisdiction is a matter of constitutional delineation, the Legislature could not and has not by the passage of the Uniform Declaratory Judgments Act, empowered the district courts to render advisory opinions. In 1960, this court again reiterated the principle that the giving of such opinions is not a judicial function, but that in governmental affairs, the duty to render advisory opinions is vested in the executive branch of government and that in private business, the giving of legal advice is the function of the legal profession. California Products, Inc. v. Puretex Lemon Juice, Inc., 160 Tex. 586, 334 S.W.2d 780 (1960). Also in the Puretex case, this court cited and quoted from Ladner v. Siegel, 294 Pa. 368, 144 A. 274 (1928), as correctly laying down the proposition that the Declaratory Judgments Act gives the court no power to pass upon hypothetical or contingent situations, or determine questions not then essential to the decision of an actual controversy, although such questions may in the future require adjudication.

Puretex controls this case. The parties have posed a problem which is hypothetical, 'iffy' and contingent. Firemen's Insurance Company, as petitioner here, presents the following points of error:
'The Court of Civil Appeals erred in holding that Larry Buttler was legally obligated within the terms of the insurance policy here involved to pay damages occasioned by the tort of his wife (Sarah Buttler) even though he in no way participated therein.'

'The Court of Civil Appeals erred in failing to hold that in any event Larry Buttler's legal obligation for a tort of his wife, not participated in nor aided or abetted by him, should be the amount of his interest in the community estate of the marriage subject to execution and consequently petitioner's liability under its policy would be limited to such amount.'

[5] The contentions raised by these points present interesting questions of law as is demonstrated by the opinion of the Court of Civil Appeals. The question posed is whether or not under the facts of this case, Larry Buttler is liable for the torts of his wife, Sarah Buttler. But, no court has yet decided whether Mrs. Buttler has committed a tort which would render her liable in damages to Mrs. Burch. That is the issue involved in the untried cause of

Burch v. Buttler. At present, the question is hypothetical—'If Mrs. Buttler be held liable to Mrs. Burch for damages in tort, is Larry Buttler to be held liable also although he did not aid or abet in the conduct of his wife, which is alleged to be tortious.' Should this question be answered, then the following 'iffy' question arises. If Larry Buttler be held liable for his wife's tort, should the liability of the petitioner insurance company be limited to the amount of his interest in the community estate of the marriage subject to execution?

Of course, If Mrs. Burch should fail to establish her case against Mrs. Buttler, the questions raised by petitioner's points would be purely academic and we would have had a considerable amount of judicial wheel spinning for nothing.

**\*334** We can well appreciate that the parties would prefer a definite answer by this court to the questions posed by petitioner's points rather than to take an 'educated guess' based upon a study of our prior decided cases and authoritative materials as to what we would hold,—as, if and when the questions are presented in justiciable form. However, the giving of advice as to proposed or possible settlements is not a judicial function. As a practical matter if for no other reason, this must be left to the profession.

In Lide v. Mears, 231 N.C. 111, 56 S.E.2d 404 (1949), cited with approval in the Puretex case, the North Carolina Supreme Court said:

> 'There is much misunderstanding as to the object and scope of this legislation (Uniform Declaratory Judgment Act). Despite some notions to the contrary, it does not undertake to convert judicial tribunals into counsellors and impose upon them the duty of giving advisory opinions to any parties who may come into court and ask for either academic enlightenment or practical guidance concerning their legal affairs. Town of Tryon v. Duke Power Co., 222 N.C. 200, 22 S.E.2d 450; Allison v. Sharp, 209 N.C. 477, 184 S.E. 27; Poore v. Poore, 201 N.C. 791, 161 S.E. 532; Anderson on Declaratory Judgments, section 13. This observation may be stated in the vernacular in this wise: The Uniform Declaratory Judgment Act does not license litigants to fish in judicial ponds for legal advice.'

2014 WL 4058727
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION
AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Austin.

The RAILROAD COMMISSION OF TEXAS,
Appellant
v.
CENTERPOINT ENERGY RESOURCES CORP.
d/b/a CenterPoint Energy Entex and CenterPoint
Energy Texas Gas, Appellee.
The Railroad Commission of Texas, Appellant
v.
Texas Gas Service Company, a Division of
ONEOK, Inc., Appellee.
The Railroad Commission of Texas, Appellant
v.
CenterPoint Energy Resources Corp. d/b/a
CenterPoint Energy Entex and CenterPoint Energy
Texas Gas, Appellee.

Nos. 03–13–00533–CV, 03–13–00534–CV,
03–13–00535–CV. | Aug. 14, 2014.

From the District Court of Travis County, 98th Judicial
District, No. D–1–GN–10–003981, Stephen Yelenosky,
Judge Presiding.
From the District Court of Travis County, 200th Judicial
District, No. D–1–GN–10–003983, Stephen Yelenosky,
Judge Presiding.
From the District Court of Travis County, 126th Judicial
District, No. D–1–GN–10–003982, Stephen Yelenosky,
Judge Presiding.

**Attorneys and Law Firms**

Douglas Fraser, Assistant Attorney General,
Environmental Protection Division, Kellie E. Billings,
Assistant Attorney General, Environmental Protection &
Admin. Law Division, Austin, TX, for Appellant.

Dane McKaughan, Greenberg Traurig, LLP, Austin, TX,
for Appellee.

Before Justices PURYEAR, GOODWIN, and FIELD.

*MEMORANDUM OPINION*

MELISSA GOODWIN, Justice.

**\*1** The Texas Railroad Commission (the Commission)
appeals the trial court's reversal in part of its final orders
in three annual review proceedings under cost-of-service
adjustment (COSA) tariffs involving essentially identical
issues. CenterPoint Energy Resources Corp. d/b/a
CenterPoint Energy Entex and CenterPoint Energy Texas
Gas (CenterPoint) and Texas Gas Service Company, a
Division of ONEOK, Inc. (Texas Gas) (the Utilities) sued
for judicial review of final orders issued by the
Commission denying the Utilities' recovery of certain
expenses for meals, lodging, and other items and ordering
certain guidelines for recovery of similar expenses in
future COSA reviews. Because we conclude that the
Utilities' claims are not ripe, we reverse the trial court's
judgment and dismiss the Utilities' claims.

**FACTUAL AND PROCEDURAL BACKGROUND**

In April 2010, the Utilities applied for cost-of-service
adjustments to their rates pursuant to annual reviews
authorized under their respective COSA tariffs for certain
service areas. Rates for the affected customers were
initially determined in contested case hearings that
resulted in the adoption of tariffs with COSA clauses. A
COSA clause is a formula included in a utility's tariff that
allows adjustments to customer charges without the
necessity of a full-blown "Statement of Intent" rate case.
*See Texas Coast Utils. Coal. v. Railroad Comm'n,* 423
S.W.3d 355, 357, 374 (Tex.2014) (upholding authority of
Commission to adopt gas utility rate schedule providing
for automatic annual adjustments based on increases or
decreases in utility's cost of service, i.e., COSA clause).
The terms of a COSA clause vary depending on what is
approved as part of the tariff in the rate case. The tariffs in
these cases provide that the annual rate adjustment is to be
determined by a calculation based on calendar year
operating expenses, return investment, and certain taxes.
If the resulting change is positive, the amount charged
goes up; if it is negative, the amount charged goes down.
The adjustment is capped at 5% of the customer charge
that was in effect at the end of the preceding calendar year
in CenterPoint's tariffs and at the percentage change in
the Consumer Price Index for All Urban Consumers in
Texas Gas's tariff. These were the first COSA filings

Railroad Com'n of Texas v. CenterPoint Energy Resources..., Not Reported in...

2014 WL 4058727

made by the Utilities under their respective tariffs.

A COSA tariff annual review is a streamlined procedure that does not include a hearing; instead, the adjustment is determined following staff review of the evidence filed by the utility. In each of the present cases, the Commission questioned and ultimately disallowed certain expenses for meals, travel, and other items for which the Utilities could not produce itemized receipts.[1] In its final orders, the Commission made certain findings of fact and conclusions of law concerning the disallowed expenses and included two "ordering paragraphs" requiring the Utilities to meet certain evidentiary criteria for recovery of similar expenses in the future.[2] The two ordering paragraphs provided:

[1] The removal of the disputed expenses did not result in any change to the Utilities' proposed adjustments, and the record reflects that the Utilities withdrew their requests for the questioned expenses.

[2] In each case, calculation errors not relevant to this appeal were corrected and a nunc pro tunc order issued.

**\*2 IT IS FURTHER ORDERED** that [the Utilities] shall not include any employee or contractor expenses from employee or contractor expense reports reimbursement in future COSA filings that cannot be supported by a detailed itemized receipt which shows the specific amounts and line item charges.

**IT IS FURTHER ORDERED** that [the Utilities] shall identify and justify each meal expense that exceeds $25.00 per person and any lodging expense over $150.00 per person per night that [the Utilities] propose[ ] to include in future COSAs.

The Utilities filed motions for rehearing complaining that the findings of fact, conclusions of law, and ordering paragraphs concerning the disallowed expenses were statements of new policy, not backed by any rule or guideline, and were therefore made through unlawful procedure, arbitrary and capricious, and not supported by substantial evidence. The Commission denied the motions for rehearing, and the Utilities filed suits for judicial review asserting the same claims. *See* Tex. Util.Code § 105.001(a) (any party to proceeding before Commission entitled to judicial review under substantial evidence rule). The Commission filed motions to dismiss based, in part, on its contention that the Utilities were requesting advisory opinions because their claims are not ripe. The trial court denied the Commission's motions to dismiss

and reversed the final orders, finding that the Commission acted arbitrarily and capriciously by imposing a new policy in the orders and that the policy was made through unlawful procedure and was not supported by substantial evidence. These appeals followed.

## DISCUSSION

In its first issue, the Commission argues that the Utilities' claims are not ripe and they therefore seek an impermissible advisory opinion.[3] The Commission contends that the Utilities request a predetermination of a hypothetical matter that could arise in the future, which is not a matter fit for judicial consideration. The Utilities argue that the orders "expressly appl [y] ... to future COSA proceedings," "mandate the manner in which all future rate adjustments filed pursuant to the applicable COSA tariff will be resolved," and "fundamentally change the way in which COSA adjustments are calculated in future COSA proceedings." They further contend that the orders place "obligations and burdens on [them] *now,* and that failure to abide by these new obligations and burdens could bar recovery in a future COSA proceeding." Thus, the Utilities contend, they seek real relief and an opinion that will affect "all COSA cases [they] will file in the future," not an advisory opinion.

[3] The Commission also contends that the Utilities lack standing because in their motions for rehearing, they did not challenge the Commission's final decisions on rate adjustments and instead attacked only the underlying findings of fact and conclusions of law. This Court has held that to have standing to seek judicial review, one must be aggrieved by the final order and not merely by an underlying finding or conclusion, *see GTE Sw. Inc. v. Public Util. Comm'n of Tex.,* 37 S.W.3d 546, 548 (Tex.App.-Austin 2001, no pet.)(citing *Champlin Exploration, Inc. v. Railroad Comm'n,* 627 S.W.2d 250, 252 (Tex.App.-Austin 1982, writ ref'd n.r.e.)). However, the Utilities' motions for rehearing expressly challenged the ordering paragraphs as well as the findings and conclusions. We overrule the Commission's first issue as to this argument.

"The courts of this state are not empowered to give advisory opinions[, and] [t]his prohibition extends to cases that are not yet ripe." *Patterson v. Planned Parenthood of Hous. & Se. Tex., Inc.,* 971 S.W.2d 439, 443 (Tex.1998) (citations omitted). The ripeness doctrine "serves to avoid premature adjudication" and "focuses on whether the case involves 'uncertain or contingent future events that may not occur as anticipated, or indeed may

Railroad Com'n of Texas v. CenterPoint Energy Resources..., Not Reported in...

2014 WL 4058727

not occur at all.' " *Perry v. Del Rio,* 66 S.W.3d 239, 250 (Tex.2001) (citations omitted). "A case is not ripe when its resolution depends on contingent or hypothetical facts, or upon events that have not yet come to pass." *Patterson,* 971 S.W.2d at 443. "Ripeness is both a question of timing, that is, when one may sue, a question of discretion, or whether the court *should* hear the suit, and not whether it *can* hear the suit." *Atmos Energy Corp. v. Abbott,* 127 S.W.3d 852, 858 (Tex.App.-Austin 2004, no pet.)(internal citations omitted) (citing *Perry,* 66 S.W.3d at 249–50; *Patterson,* 971 S.W.2d at 442; *City of Waco v. Texas Natural Res. Conserv. Comm'n,* 83 S.W.3d 169, 177 (Tex.App.-Austin 2002, pet. denied)). "In the administrative-law context, moreover, avoiding premature litigation over administrative determinations prevents courts from 'entangling themselves in abstract disagreements over administrative policies' while simultaneously allowing the agency to perform its functions unimpeded." *Trinity Settlement Servs., LLC v. Texas State Secs. Bd.,* 417 S.W.3d 494, 506 (Tex.App.-Austin 2013, pet. denied) (quoting *Patterson,* 971 S.W.2d at 443). The determination of ripeness depends on "(1) the fitness of the issues for judicial decision; and (2) the hardship occasioned to the party by the court's denying judicial review." *Atmos Energy,* 127 S.W.3d at 858 (citing *Perry,* 66 S.W.3d at 250 (citing *Abbott Labs. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *City of Waco,* 83 S.W.3d at 177)). Ripeness should be decided on the basis of all the information available to the court, and we may consider intervening events that occur after the decision in the lower court. *Perry,* 66 S.W.3d at 250; 13 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice & Procedure* § 3532.1, at 136–37 (2d ed.1984).

**\*3** We do not believe the Utilities have affirmatively established that the issues they presented were fit for review and that the failure to address those issues would constitute a hardship on the Utilities. *See Perry,* 66 S.W.3d at 250; *Atmos Energy,* 127 S.W.3d at 858. Whether there may be an actual controversy between the Utilities and the Commission is too uncertain and speculative to support the Utilities' contention that their claims are ripe. Because the Utilities complain of future enforcement, they must show that enforcement is "imminent or sufficiently likely." *See Trinity Settlement,* 417 S.W.3d at 506; *Rea v. State,* 297 S.W.3d 379, 383 (Tex.App.-Austin 2009, no pet.)(to establish ripeness, plaintiffs must demonstrate injury is imminent, direct, and immediate, not merely remote, conjectural, or hypothetical); *Atmos Energy,* 127 S.W.3d at 856; *City of Waco,* 83 S.W.3d at 175. A perceived threat of enforcement does not create a justiciable controversy. *Compare Mitz v. Texas State Bd. of Veterinary Med.*

*Exam'rs,* 278 S.W.3d 17, 25 (Tex.App.-Austin 2008, pet. dism'd), *with Beacon Nat'l Ins. Co. v. Montemayor,* 86 S.W.3d 260, 267–68 (Tex.App.-Austin 2002, no pet.).

The Utilities attempt to characterize their claims as ripe by arguing that the language of the ordering paragraphs will require them to meet evidentiary requirements in all future annually required COSA filings and that the orders place "obligations and burdens" on them now. Tellingly, however, the Utilities argue that their failure to meet these obligations and burdens *could* bar recovery in a *future* COSA proceeding. This perceived threat as to future COSA filings does not rise to the level of imminent or likely injury so as to present a justiciable claim. *See Mitz,* 278 S.W.3d at 25 (contrasting actual initiation of administrative action suggesting imminent proceeding in that case with mere perceived threat in *Beacon Nat'l,* 86 S.W.3d at 267–68). And while we may consider intervening events that occur after a decision in the lower court, *see Perry,* 66 S.W.3d at 250, the Utilities have not presented any evidence that the Commission has taken any steps to impose the requirements on them since issuing the final orders or that there is any existing or continuing threat of liability or penalty. *Cf. Mitz,* 278 S.W.3d at 25–26 (constitutional claim ripe for review considering continuing threat of civil and criminal liability against practitioners and direct effect act had on business enterprise); *Patel v. Texas Dep't of Licensing & Regulation,* No. 03–11–00057–CV, 2012 Tex.App. LEXIS 6187, at \*23,2012 WL 3055479 (Tex.App.-Austin July 25, 2012, pet. granted) (constitutional claims ripe where appellants subject to continuing threat of civil and criminal liability, as well as administrative penalties and sanctions). Thus, the Utilities have not established that enforcement is imminent or sufficiently likely, *see Trinity Settlement,* 417 S.W.3d at 506; *Atmos Energy,* 127 S.W.3d at 856; *City of Waco,* 83 S.W.3d at 175, and we conclude that the Utilities' issues are not fit for judicial review, *see Perry,* 66 S.W.3d at 250; *Atmos Energy,* 127 S.W.3d at 858.

**\*4** To prevail, the Utilities must show that they would suffer hardship if judicial review is withheld until enforcement of the requirements in the ordering paragraphs. *See Perry,* 66 S.W.3d at 250; *Atmos Energy,* 127 S.W.3d at 858. Hardship is shown when the statute, rule, or policy at issue " 'requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance.' " *Mitz,* 278 S.W.3d at 26 (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 153, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). When the requirement at issue has a direct and immediate impact on the party's business and places it in jeopardy of sanction or penalty, that is sufficient to show a hardship.

353 S.W.3d 753
Supreme Court of Texas.

Carroll G. ROBINSON, Bruce R. Hotze, and
Jeffrey N. Daily, Petitioners,
v.
Annise D. PARKER, Mayor; City of Houston;
Houston City Council, et al., Respondents.

No. 08–0658. | Argued Nov. 18, 2009. | Decided
Aug. 26, 2011. | Rehearing Denied Oct. 21, 2011.

**Synopsis**
**Background:** Citizens, who were sponsors of
citizen-initiated referendum proposition, brought action
against city, mayor, and city council, seeking declaratory
judgment that the proposition was valid and must be
enforced. The 333rd District Court, Harris County, Joseph
J. Halbach, J., granted citizens motion for summary
judgment. Defendants appealed. The Houston Court of
Appeals, 260 S.W.3d 463, reversed, concluding that
citizens lacked standing. Citizens filed petition for review.

**[Holding:]** The Supreme Court, Paul W. Green, J., held
that citizens' declaratory claims were not ripe.

Judgments of Court of Appeals and District Court
vacated; case dismissed.

**Attorneys and Law Firms**

**\*753** William A. 'Andy' Taylor, Amanda Eileen Staine
Peterson, Andy Taylor & Associates, P.C., Houston, TX,
for Carroll G. Robinson.

Scott J. Atlas, Bill White for Texas, Patrick W. Mizell,
Stacey Neumann Vu, Vinson & Elkins LLP, Stephen
Douglas Pritchett Jr., David M. Gunn, Beck Redden &
Secrest, L.L.P. Arturo G. Michel, City Attorney, City of
Houston Legal Dept., Patrick Zummo, Law Offices of
Patrick Zummo, John Berchmans Daily, Weil Gotshal &
Manges LLP, Houston, TX, **\*754** Melanie Plowman
Sarwal, Weil Gothshal & Manges LLP, Austin, TX, for
Bill White.

Jonathan Day, Andrews Kurth LLP, Warren W. Harris,
Bracewell & Giuliani, LLP, Houston, TX, for Amicus
Curiae Continental Airlines, Inc.

David A. Furlow, Thompson & Knight, L.L.P., Levi
James Benton, Benton Massey PLLC, Houston, TX, for
Amicus Curiae Francis M. Kubosh.

**Opinion**

Justice GREEN delivered the opinion of the Court.

In this case, we are asked to decide (1) whether citizens
who signed a petition proposing a local ballot initiative
have standing to assert their declaratory judgment claims
that the voter-approved initiative is valid and must be
enforced; and (2) the validity of the voter-approved
initiative. Because the citizens' claims are not ripe,
however, we cannot reach those issues.

**I**

Petitioners Carroll G. Robinson, Bruce R. Hotze, and
Jeffrey N. Daily are citizens of Houston who participated
to varying degrees in efforts to place a proposition
regarding city revenues and spending on the ballot for
public referendum. Hotze and Daily organized the petition
drive and helped draft the final language of the proposal.
All three Petitioners signed the petition, donated time and
money to campaigns promoting the passage of the
proposition, and voted in favor of it.

On November 2, 2004, Houston voters passed the
proposition, called Proposition 2, as well as Proposition 1,
which the Houston City Council had placed on the ballot
by its own act in response to Prop. 2.[1] Prop. 1 garnered
more votes, with 280,596 favorable votes, or 64% of the
total, as opposed to 242,697 favorable votes for Prop. 2,
or 56% of the total. However, the City of Houston
determined that, because Prop. 1 and Prop. 2 conflict,
Prop. 2 was ineffective and unenforceable. The City based
that determination both on what Petitioners refer to as
Prop. 1's "poison pill provision,"[2] and on the
conflicting-ordinance provision in the Houston City
Charter. *See* Hous., Tex., Code Ordinances, City Charter
art. IX, § 19 (2006) ("[A]t any election for the adoption of
amendments if the provisions of two or more proposed
amendments approved at said election are inconsistent the
amendment receiving the highest number of votes shall
prevail."). The mayor therefore **\*755** did not certify the
results of the passage of Prop. 2 to the secretary of state,
and the city council did not enter an order in the city
records declaring that Prop. 2 had been adopted. *See*

LOC. GOV'T CODEE §§ 9.005(b) (requiring city council to pass an ordinance declaring the adoption of an initiative that receives a majority of the vote), 9.007 (requiring mayor to certify results of an election that passes a charter amendment to the secretary of state).

1    Prop. 2 was described on the ballot as:
     The City Charter of the City of Houston shall be amended to require voter approval before the City may increase total revenues from all sources by more than the combined rates of inflation and population, without requiring any limit of any specific revenue source, including water and sewer revenues, property taxes, sales taxes, fees paid by utilities and developers, user fees, or any other sources of revenues.
     Prop. 1 was described on the ballot as:
     The Charter of the City of Houston shall be amended to require voter approval before property tax revenues may be increased in any future fiscal year above a limit measured by the lesser of 4.5% or the cumulative combined rates of inflation and population growth. Water and sewer rates would not increase more than the cumulative combined rates of inflation and population growth without prior voter approval. The Charter Amendment also requires minimum annual increases of 10% in the senior and disabled homestead property tax exemptions through the 2008 tax year.

2    Prop. 1 provides:
     If another proposition for a Charter amendment relating to limitations on increases in City revenues is approved at the same election at which this proposition is also approved, and if this proposition receives the higher number of favorable votes, then this proposition shall prevail and the other shall not become effective.

Petitioners sought relief from the court of appeals, which granted their petition for writ of mandamus, holding that the City had failed to perform the ministerial duties of certifying the results to the secretary of state and entering an order declaring the charter amendments to have been adopted. *In re Robinson,* 175 S.W.3d 824, 826–32 (Tex.App.-Houston [1st Dist.] 2005, orig. proceeding). On the same day that they petitioned for mandamus relief, Petitioners filed the underlying suit seeking a declaratory judgment that Prop. 2 is effective and must be enforced. While that case was pending, the city council passed an ordinance recognizing that both Prop. 1 and Prop. 2 had passed but also declaring that Prop. 1 had received the higher number of votes. As a result, both propositions became part of the Houston City Charter. *See* Hous., Tex.,

Code Ordinances, City Charter art. III, § 1; art. VI-a, § 7; art. IX, § 20 (2006). The trial court ultimately granted summary judgment in favor of Petitioners. The court of appeals, however, ruled that Petitioners lacked standing to assert their claims, relying on our holding in *Brown v. Todd,* 53 S.W.3d 297, 305 (Tex.2001). 260 S.W.3d 463, 470–72 (Tex.App.-Houston [14th Dist.] 2008, pet. filed). The court remanded the case to the trial court to allow Petitioners to amend their pleadings and establish standing. *Id.* at 466.

Robinson, Hotze, and Daily petition for review on two grounds.[3] First, they assert that the court of appeals erred when it determined that Petitioners lack standing. Second, they ask us to consider the merits of their claim that Prop. 2 should be enforced.

3    The current Houston mayor has been substituted for her predecessor. *See* TEX.R.APP. P. 7.2(a) (automatic substitution when public officer is party in official capacity).

## II

[1] [2] [3] [4] Ripeness "is a threshold issue that implicates subject matter jurisdiction ... [and] emphasizes the need for a concrete injury for a justiciable claim to be presented." *Patterson v. Planned Parenthood of Hous. & Se. Tex.,* 971 S.W.2d 439, 442 (Tex.1998). In evaluating ripeness, we consider "whether, *at the time a lawsuit is filed,* the facts are sufficiently developed 'so that an injury has occurred or is likely to occur, rather than being contingent or remote.' " *Waco Indep. Sch. Dist. v. Gibson,* 22 S.W.3d 849, 851–52 (Tex.2000) (emphasis in original) (quoting *Patterson,* 971 S.W.2d at 442). Although a claim is not required to be ripe at the time of filing, if a party cannot demonstrate a reasonable likelihood that the claim will soon ripen, the case must be dismissed. *See Perry v. Del Rio,* 66 S.W.3d 239, 251 (Tex.2001).

[5] The record is silent as to whether the City has, in fact, failed to comply with the Prop. 2 spending caps. As the parties acknowledged at oral argument, the record in this case indicates that then-mayor Bill White, in response to Prop. 2's inclusion in the City Charter, stated his intention to comply with the caps Prop. 2 imposed. In an attempt to show noncompliance, Petitioners presented several documents with their post-submission brief. Petitioners point to a May 2009 letter from then- **\*756** controller Annise Parker, who is now mayor of Houston, stating that the controller's office is "no longer responsible for

852 S.W.2d 440
Supreme Court of Texas.

TEXAS ASSOCIATION OF BUSINESS, Appellant,
v.
TEXAS AIR CONTROL BOARD and Texas Water
Commission, Appellees.

No. C–9556. | March 3, 1993. | Rehearing Overruled
May 5, 1993.

Business association sought declaratory judgment that statutes authorizing administrative agencies to assess fines for violation of environmental laws are unconstitutional. The 250th District Court, Travis County, upheld statutes, and direct appeal was taken. The Supreme Court, Cornyn, J., held that: (1) statutes authorizing Air Control Board and Water Commission to assess fines prior to judicial review violate open courts guarantee of Texas Constitution, but (2) statutes do not violate constitutional right to jury trial.

Affirmed in part and reversed in part.

Doggett, Gammage, and Spector, JJ., concurred, dissented, and filed opinions.

**Attorneys and Law Firms**

**\*441** R. Kinnan Golemon, James W. Checkley, Jr., Albert R. Axe, Jr., Scott R. Kidd and Douglas W. Alexander, Austin, for appellant.

Douglas G. Caroom, Mary E. Kelly, Dan Morales, Nancy N. Lynch, William D. Dugat, III and Amy R. Johnson, Austin, for appellees.

**OPINION**

CORNYN, Justice.

The Texas Association of Business (TAB), on behalf of its members, brought this declaratory judgment action seeking a ruling that statutes empowering two state administrative agencies to levy civil penalties for violations of their regulations conflict with the open courts and jury trial provisions of the Texas Constitution. The administrative agencies denied TAB's claims, and

along with two Intervenors,[1] filed counterclaims seeking a declaration **\*442** that the same statutes and regulations comport with those constitutional provisions.

[1]   The League of Women Voters and the Lone Star Chapter of the Sierra Club intervened in the suit and were aligned as defendants with the Texas Air Control Board and the Texas Water Commission. Justice Doggett contends that the standing of the Intervenors should be addressed along with TAB's. We disagree. Standing concerns a party's faculty to invoke the court's subject matter jurisdiction. Once it has been invoked by a plaintiff, a court's subject matter jurisdiction is not affected by the status of defendants or intervenors aligned in interest with defendants.

Following a bench trial, the trial court denied the relief sought by TAB, and as requested by the State and Intervenors, declared that section 4.041 of the Texas Clean Air Act, sections 26.136 and 27.1015 of the Texas Water Code, and section 8b of the Texas Solid Waste Disposal Act, as well as the rules and regulations promulgated under those statutes, are constitutional with regard to the open courts and jury trial provisions. We affirm the trial court's judgment as it relates to TAB's jury trial challenge and reverse its judgment as to TAB's open courts challenge.

An overview of the regulatory scheme enacted by the legislature and these agencies is essential to an understanding of this case. In 1967, the Texas Legislature enacted the Clean Air Act of Texas. Clean Air Act of Texas, 60th Leg., R.S., ch. 727, 1967 Tex.Gen.Laws 1941. The Clean Air Act was designed to safeguard the state's air resources without compromising the economic development of the state. *Id.* at § 1. The Act created the Texas Air Control Board and granted it the authority to promulgate regulations to accomplish the Act's goals. *Id.* at § 4(A)(2)(a). In the event the Air Control Board determined that a violation of its regulations had occurred, it was authorized to enforce those regulations in district court. Upon a judicial determination that a violation of the Air Control Board's regulations had occurred, two cumulative remedies were available, injunctive relief to prohibit further violations and assessment of a fine ranging from $50 to $1,000 for each day the violations persisted. *Id.* at § 12(B).

In 1969, the Texas Legislature enacted the Solid Waste Disposal Act. Solid Waste Disposal Act, 61st Leg., R.S., ch. 405, 1969 Tex.Gen.Laws 1320. The express purpose for this legislation was to protect public health and welfare by regulating the "collection, handling, storage,

unconstitutional denial of a jury trial and violation of our constitution's open courts provision.

[4] "An appeal may be taken directly to the supreme court from an order of a trial court granting or denying an interlocutory or permanent injunction on the ground of the constitutionality of a statute of this state." TEX.GOV'T CODE § 22.001(c).

## I. Standing

Before we reach the merits of this case, we first consider the matter of the trial court's jurisdiction, as well as our own; specifically we determine whether TAB has standing to challenge the statutes and regulations in question. Because TAB's standing to bring this action is not readily apparent, and because our jurisdiction as well as that of the trial court depends on this issue, we requested supplemental briefing on standing at the oral argument of this case. In response, the parties insist that any question of standing has been waived in the trial court and cannot be raised by the court for the first time on appeal. We disagree.

[1] Subject matter jurisdiction is essential to the authority of a court to decide a case. Standing is implicit in the concept of subject matter jurisdiction. The standing requirement stems from two limitations on subject matter jurisdiction: the separation of powers doctrine and, in Texas, the open courts provision. Subject matter jurisdiction **\*444** is never presumed and cannot be waived.[5]

[5] Justice Doggett confuses subject matter jurisdiction with personal jurisdiction. Only the latter can be waived when uncontested. See TEX.R.CIV.P. 120a.

[2] [3] One limit on courts' jurisdiction under both the state and federal constitutions is the separation of powers doctrine. See TEX.CONST. art. II, § 1; *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 471–74, 102 S.Ct. 752, 757–60, 70 L.Ed.2d 700 (1982); *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975); *see also,* Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers,* 18 SUFFOLK U.L.Rev. 881, 889 n. 69 (1983) (noting that the dicta of *Flast v. Cohen,* 392 U.S. 83, 100, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968), suggesting that

standing is unrelated to the separation of powers doctrine has since been disavowed). Under this doctrine, governmental authority vested in one department of government cannot be exercised by another department unless expressly permitted by the constitution. Thus we have construed our separation of powers article to prohibit courts from issuing advisory opinions because such is the function of the executive rather than the judicial department.[6] *Firemen's Ins. Co. v. Burch,* 442 S.W.2d 331, 333 (Tex.1969); *Morrow v. Corbin,* 122 Tex. 553, 62 S.W.2d 641, 644 (Tex.1933). Accordingly, we have interpreted the Uniform Declaratory Judgments Act, TEX.CIV.PRAC. & REM.CODE §§ 37.001–.011, to be merely a procedural device for deciding cases already within a court's jurisdiction rather than a legislative enlargement of a court's power, permitting the rendition of advisory opinions. *Firemen's Ins. Co.,* 442 S.W.2d at 333; *United Serv. Life Ins. Co. v. Delaney,* 396 S.W.2d 855, 863 (Tex.1965); *California Prods., Inc. v. Puretex Lemon Juice, Inc.,* 160 Tex. 586, 334 S.W.2d 780 (1960).

[6] The analysis is the same under the federal constitution. *See e.g. Correspondence of the Justices,* Letter from Chief Justice John Jay and the Associate Justices to President George Washington, August 8, 1793 in Laurence H. Tribe, *American Constitutional Law* 73 n. 3 (2nd ed. 1988).

[4] [5] The distinctive feature of an advisory opinion is that it decides an abstract question of law without binding the parties. *Alabama State Fed'n of Labor v. McAdory,* 325 U.S. 450, 461, 65 S.Ct. 1384, 1389, 89 L.Ed. 1725 (1945); *Firemen's Ins. Co.,* 442 S.W.2d at 333; *Puretex Lemon Juice, Inc.,* 160 Tex. at 591, 334 S.W.2d at 783. An opinion issued in a case brought by a party without standing is advisory because rather than remedying an actual or imminent harm, the judgment addresses only a hypothetical injury. *See Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Texas courts, like federal courts, have no jurisdiction to render such opinions.

[6] The separation of powers doctrine is not the only constitutional basis for standing. Under federal law, standing is also an aspect of the Article III limitation of the judicial power to "cases" and "controversies." *Sierra Club v. Morton,* 405 U.S. 727, 731, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). To comport with Article III, a federal court may hear a case only when the litigant has been threatened with or has sustained an injury. *Valley Forge Christian College,* 454 U.S. at 471, 102 S.Ct. at 758. Under the Texas Constitution, standing is implicit in the open courts provision, which contemplates access to

the courts only for those litigants suffering an injury. Specifically, the open courts provision provides:

> All courts shall be open, and every person for an **injury** done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

TEX. CONST. art. I, § 13 (emphasis added). Because standing is a constitutional prerequisite to maintaining a suit under both federal and Texas law, we look to the more extensive jurisprudential experience of the federal courts on this subject for any guidance it may yield.

Under federal law, a lack of standing deprives a court of subject matter jurisdiction because standing is an element of such **\*445** jurisdiction. *Carr v. Alta Verde Indus.,* 931 F.2d 1055, 1061 (5th Cir.1991); *Simmons v. Interstate Commerce Comm'n,* 900 F.2d 1023, 1026 (7th Cir.1990); *M.A.I.N. v. Commissioner, Maine Dept. of Human Serv.,* 876 F.2d 1051, 1053 (1st Cir.1989); *Haase v. Sessions,* 835 F.2d 902, 908 (D.C.Cir.1987); *Page v. Schweiker,* 786 F.2d 150, 153 (3d Cir.1986); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Heckler v. Mathews,* 465 U.S. 728, 737, 104 S.Ct. 1387, 1394, 79 L.Ed.2d 646 (1984); *Warth,* 422 U.S. at 511, 95 S.Ct. at 2211. Other states have followed this analysis in construing their own constitutions.[7] *See e.g., Prudential–Bache Sec., Inc. v. Commissioner of Revenue,* 412 Mass. 243, 588 N.E.2d 639, 642 (1992); *Bennett v. Board of Trustees for Univ. of N. Colorado,* 782 P.2d 1214, 1216 (Colo.App.1989), *cert. denied,* 797 P.2d 748 (Colo.1990); *Pace Constr. Co. v. Missouri Highway and Transp. Comm'n,* 759 S.W.2d 272, 274 (Mo.App.1988); *Terracor v. Utah Bd. of State Lands & Forestry,* 716 P.2d 796, 798–99 (Utah 1986); *State by McClure v. Sports and Health Club, Inc.,* 370 N.W.2d 844, 850 (Minn.1985), *appeal dism'd,* 478 U.S. 1015, 106 S.Ct. 3315, 92 L.Ed.2d 730 (1986); *Smith v. Allstate Ins. Co.,* 483 A.2d 344, 346 (Me.1984); *Ardmare Constr. Co. v. Freedman,* 191 Conn. 497, 467 A.2d 674, 675 n. 4, 676–77 (1983); *Horn v. County of Ventura,* 24 Cal.3d 605, 156 Cal.Rptr. 718, 726, 596 P.2d 1134, 1142 (1979); *Stewart v. Board of County Comm'rs of Big Horn County,* 175 Mont. 197, 573 P.2d 184, 186, 188 (1977); *State ex rel. Albritton v. Moore,* 238 La. 728, 116 So.2d 502, 504 (1959).

7   Of the states listed by Justice Doggett, only Illinois, Iowa, Kentucky, New York, South Dakota, and perhaps Ohio, Pennsylvania and Washington actually treat jurisdictional standing as waivable. *See* 852 S.W.2d at 469. The other state cases cited deal with the waiver of

objections to join a real party in interest or to a party's capacity to sue rather than to jurisdictional standing. *See International Depository, Inc. v. State,* 603 A.2d 1119, 1122 (R.I.1992) (addressing real party in interest objection); *Princess Anne Hills Civ. League, Inc. v. Susan Constant Real Estate Trust,* 243 Va. 53, 413 S.E.2d 599, 603 n. 1 (1992) (addressing real party in interest objection); *Sanford v. Jackson Mall Shopping Ctr. Co.,* 516 So.2d 227, 230 (Miss.1987) (addressing real party in interest objection); *Jackson v. Nangle,* 677 P.2d 242, 250 n. 10 (Alaska 1984) (addressing real party in interest objection); *Poling v. Wisconsin Physicians Serv.,* 120 Wis.2d 603, 357 N.W.2d 293, 297–98 (App.1984) (addressing real party in interest objection); *Torrez v. State Farm Mut. Auto. Ins. Co.,* 130 Ariz. 223, 635 P.2d 511, 513 n. 2 (App.1981) (addressing real party in interest objection); *Brown v. Robinson,* 354 So.2d 272, 273 (Ala.1977); *Cowart v. City of West Palm Beach,* 255 So.2d 673, 675 (Fla.1971) (addressing capacity objection).

[7] Subject matter jurisdiction is an issue that may be raised for the first time on appeal; it may not be waived by the parties. *Texas Employment Comm'n v. International Union of Elec., Radio and Mach. Workers, Local Union No. 782,* 163 Tex. 135, 352 S.W.2d 252, 253 (1961); RESTATEMENT (SECOND) OF JUDGMENTS § 11, comment c (1982). This court recently reiterated that axiom in *Gorman v. Life Insurance Co.,* 811 S.W.2d 542, 547 (Tex.), *cert. denied,* 502 U.S. 824, 112 S.Ct. 88, 116 L.Ed.2d 60 (1991). Because we conclude that standing is a component of subject matter jurisdiction, it cannot be waived and may be raised for the first time on appeal.[8]

8   Justice Doggett disagrees that standing is a component of subject matter jurisdiction, yet he declines to explain what role standing plays in our jurisprudence. From his harsh critique of the doctrine, it seems that he not only objects to the conclusion that standing cannot be waived but also to the conclusion that standing is a requirement to initiate a lawsuit.

[8] If we were to conclude that standing is unreviewable on appeal at least three undesirable consequences could result. First and foremost, appellate courts would be impotent to prevent lower courts from exceeding their constitutional and statutory limits of authority. Second, appellate courts could not arrest collusive suits. Third, by operation of the doctrines of res judicata and collateral estoppel, judgments rendered in suits addressing only hypothetical injuries could bar relitigation of issues by a litigant who eventually suffers an actual injury. We therefore hold that standing, as a component of subject

417 S.W.3d 494
Court of Appeals of Texas,
Austin.
TRINITY SETTLEMENT SERVICES, LLC,
Appellant
v.
The TEXAS STATE SECURITIES BOARD and
John Morgan, in his Official Capacity as
Commissioner of the Texas State Securities
Board[1], Appellees.

[1]    The notice of appeal and prior filings in the district
court reference the TSSB's former commissioner,
Denise Voigt Crawford, who has since retired.
Accordingly, the TSSB's current commissioner,
John Morgan, has been substituted. *See*
Tex.R.App. P. 7.2(a).

No. 03–10–00639–CV. | Aug. 1, 2013. | Rehearing
Overruled Oct. 2, 2013.

## Synopsis

**Background:** Viatical settlement company sued Texas
State Securities Board (TSSB) to obtain declaratory
judgment that TSSB acted without statutory authority in
prior enforcement action against another viatical
settlement company, and that certain investments plaintiff
proposed to sell were not "securities" as defined by Texas
Securities Act (TSA). The 53rd Judicial District Court,
Travis County, Lora Livingston, J., granted TSSB's plea
to the jurisdiction. Plaintiff appealed.

**Holdings:** The Court of Appeals, David Puryear, J., held
that:

[1] TSSB's statements in prior action did not constitute
rule under Administrative Procedure Act (APA) subject to
challenge through declaratory judgment action;

[2] in seeking declaration that TSSB acted without
statutory authority, plaintiff sought impermissible
advisory opinion; and

[3] plaintiff's requested declaration of its rights and status
was not ripe for review.

Affirmed.

## Attorneys and Law Firms

**\*497** Hector De Leon, Benjamin S. De Leon, Thomas P.
Washburn, George B. Ward, De Leon & Washburn, P.C.,
Austin, TX, for Appellant.

Lesli Gattis Ginn, Assistant Attorney General, Financial
Litigation, Tax, and Charitable Trusts Division, Austin,
TX, for Appellee.

Before Justices PURYEAR, PEMBERTON, and ROSE.

## *OPINION*

DAVID PURYEAR, Judge.

This is an appeal from a grant of a plea to the jurisdiction
stemming from a dispute regarding the Texas State
Securities Board's regulation of the sale of viatical
settlements. Appellant Trinity Settlement **\*498** Services,
LLC (Trinity), an entity proposing to engage in the sale of
viatical settlements, sued appellees the Texas State
Securities Board (TSSB) and John Morgan, in his official
capacity as Commissioner of the TSSB, to obtain a
declaratory judgment (1) that the TSSB and Morgan acted
without statutory authority in an enforcement action
against another viatical-settlement provider, Retirement
Value, LLC (RV) and (2) that certain investments Trinity
itself proposes to sell, denominated "specified
percentages of participations in the proceeds of life
insurance policies," are not "securities" as defined by the
Texas Securities Act (TSA). We affirm the trial court's
order granting the plea to the jurisdiction, concluding
Trinity failed to invoke the jurisdiction of the trial court
under either (1) the Administrative Procedure Act (APA)
section 2001.038 because it failed to challenge a rule of
the TSSB, as defined by the APA, or (2) the Uniform
Declaratory Judgments Act (UDJA) because it failed to
plead a justiciable controversy.

## BACKGROUND

### A. Viatical Settlements

A "viatical settlement" is a transaction in which an
insured sells the benefits of his or her life insurance policy
to a third party in return for a lump-sum cash payment

its own rights and status under the TSA. The UDJA grants any litigant whose rights are affected by a statute the opportunity to obtain a declaration of those rights under the statute. Tex. Civ. Prac. & Rem.Code § 37.004; *see also Texas Mun. Power Agency v. Public Util. Comm'n.,* 100 S.W.3d 510, 515 (Tex.App.-Austin 2003, pet denied). A declaratory-judgment action does not, however, give a court "jurisdiction to pass upon hypothetical or contingent situations, or to determine questions not then essential to the decision of an actual controversy, although such actions may in the future require adjudication." *Bexar Metro. Water Dist. v. City of Bulverde,* 234 S.W.3d 126, 130–31 (Tex.App.-Austin 2007, no pet.). After careful review of the record, we conclude any controversy between the TSSB and Trinity at this time is based upon hypothetical facts that have not yet matured to a ripe controversy sufficient to confer jurisdiction on the trial court. While the TSSB raises several challenges to the trial court's jurisdiction, the ripeness issue is dispositive. *See Waco Indep. Sch. Dist. v. Gibson,* 22 S.W.3d 849, 851 (Tex.2000).

[25] [26] [27] Ripeness implicates subject-matter jurisdiction and asks whether—at the time a lawsuit is filed—the facts have developed sufficiently so that an injury has occurred or is likely to occur, rather than being contingent or remote. *Rea v. State,* 297 S.W.3d 379, 383 (Tex.App.-Austin 2009, no pet.). A case is not ripe when its resolution depends on contingent or hypothetical facts, or upon events that have not yet come to pass. **\*506** *Patterson v. Planned Parenthood of Houston,* 971 S.W.2d 439, 442 (Tex.1998). A justiciable controversy, however, does not necessarily equate with a fully ripened cause of action. *Moore,* 985 S.W.2d at 153–54. Rather, an action for declaratory judgment will "lie when the fact situation manifests the presence of ripening seeds of a controversy," such that "the claims of several parties are present and indicative of threatened litigation in the immediate future which seems unavoidable, even though the differences between the parties as to their legal rights have not reached the state of an actual controversy." *Id.; see Save our Springs Alliance v. City of Austin,* 149 S.W.3d 674, 683 (Tex.App.-Austin 2004, no pet.) The constitutional prohibition against issuing advisory opinions also has a pragmatic, prudential aspect that aims to conserve "judicial time and resources for real and current controversies, rather than abstract, hypothetical, or remote disputes." *Patterson,* 971 S.W.2d at 443 (quoting *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 928 (Tex.1998)). In the administrative-law context, moreover, avoiding premature litigation over administrative determinations prevents courts from "entangling themselves in abstract disagreements over administrative policies" while simultaneously allowing the agency to

perform its functions unimpeded. *Id.*

[28] [29] In determining whether a cause is ripe for judicial consideration, we look to whether the facts have sufficiently developed to show that an injury has occurred, or is likely to occur. *City of Waco,* 83 S.W.3d at 175. When a business—like Trinity—files a "pre-enforcement" suit seeking a declaration of its rights prior to an agency enforcement action, we have concluded the controversy is ripe for review only if "an enforcement action is imminent or sufficiently likely." *Atmos Energy Corp. v. Abbott,* 127 S.W.3d 852, 856 (Tex.App.-Austin 2004, no pet.); *see also Rea,* 297 S.W.3d at 383 ("To establish that a claim is ripe based on an injury that is *likely* to occur, the plaintiff must demonstrate that the injury is imminent, direct, and immediate, and not merely remote, conjectural, or hypothetical."). In this case, the pleadings and evidence indicate the TSSB has taken no action against Trinity.[3] Although the TSSB has brought an enforcement action against other viatical settlement providers, we cannot conclude that an enforcement action against Trinity is also imminent or sufficiently likely to occur at this time.

[3]     Trinity pleads the TSSB sent its manager, Michael McDermott, correspondence in connection with the RV suit "alleging Mr. McDermott may have offered for sale and/or sold investments on behalf of RV." According to Trinity's pleadings, the TSSB letter was sent to Mr. McDermott because of his potential connection with the RV suit and not because of any action by Trinity or action by McDermott on Trinity's behalf.

Rather, whether the TSSB will bring an enforcement action against Trinity depends on many factual contingencies that have not yet come to pass and are not before the court, including whether Trinity chooses to begin selling viatical settlements, how Trinity ultimately structures its investments, the managerial efforts Trinity exerts in such sales, what type of investors purchase the viatical settlements, and whether the TSSB elects to bring an enforcement action against Trinity based on these future actions. Trinity's claim does not pose a pure question of law but instead asks the trial court to engage in a fact-based determination based upon contingent, hypothetical facts. *See Beacon Nat'l. Ins. Co. v. Montemayor,* 86 S.W.3d 260, 268 (Tex.App.-Austin 2002, no pet.) (concluding appellant's premature attempt to arrest the administrative process before the agency had taken an adverse action against it was not ripe when claim did not **\*507** present pure question of law but required the determination of several factual matters that had not sufficiently developed); *see also Atmos,* 127 S.W.3d at

TXU Elec. Co. v. Public Utility Com'n of Texas, 51 S.W.3d 275 (2001)

Util. L. Rep. P 26,789, 44 Tex. Sup. Ct. J. 854, 44 Tex. Sup. Ct. J. 1126

51 S.W.3d 275
Supreme Court of Texas.

TXU ELECTRIC COMPANY, et al., Appellants,
v.
PUBLIC UTILITY COMMISSION OF TEXAS, et al., Appellees.

No. 00–0936. | Argued Jan. 31, 2001. | Decided June 6, 2001. | Rehearing Overruled Aug. 30, 2001.

Incumbent electric utility and intervenors appealed decision by the Public Utility Commission (PUC) on financing for recovery of utility's regulatory assets and stranded costs during deregulation to competitive market. The 250th District Court, Travis County, reversed and remanded in part. Appeal was taken. The Supreme Court, Owen, J., held that: (1) the PUC could employ a second present value test to determine whether tangible and quantifiable benefits to ratepayers were provided by securitization through bonds secured by transition charges; (2) the PUC was required to assume that, absent securitization, regulatory assets and stranded costs would be recovered through competition transition charges in less than forty years; (3) it was not required to use the weighted average life of six years over which utility's transition bonds would be outstanding; (4) it lacked the discretion to consider utility's regulatory assets on an asset-by-asset basis; (5) it may apply the rate design methodology established in an utility's last rate design case to the data in that rate case, rather than to more current data; and (6) in an opinion by Hecht, J., the PUC was not required to reallocate overpayments or underpayments of transition charges by any one class among all customers.

Affirmed in part, reversed in part, and remanded.

Owen, J., dissented in part and filed opinion joined by Enoch and Baker, JJ.

**\*275 Opinion by Justice Owen**

**Attorneys and Law Firms**

**\*276** Roy Q. Minton, Minton Burton Foster & Collins, Robert J. Hearon, Jr., Mary A. Keeney, Graves Dougherty

Hearon & Moody, Austin, Robert A. Wooldridge, Robert M. Fillmore, Howard V. Fisher, Worsham Forsythe Wooldridge, Dallas, for Appellant.

**\*277** Thomas K. Anson, Sheinfeld Maley & Kay, Geoffrey M. Gay, Lloyd Gosselink Blevins Rochelle, Austin, Alan W. Harris, Dallas, Marianne Carroll, David B. Gross, Carroll & Gross, Andrew Kever, Bickerstaff Heath Smiley Pollan Kever & McDaniel, Mark C. Davis, Brickfield Burchette & Ritts, James K. Rourke, Thomas Lane Brocato, Suzi Ray McClellan, Office of Public Utility Counsel, Steven Baron, Office of Attorney General of Texas, John Cornyn, Attorney General of the State of Texas, Jeffrey S. Boyd, Karen Watson Kornell, Douglas Fraser, Bryan L. Baker, Office of the Attorney General, Jonathan Day, Lino Mendiola, Mayor Day Caldwell & Keeton, Diane Barlow–Sparkman, Mark W. Smith, J. Kay Trostle, Elizabeth H. Drews, James G. Boyle, Law Office of Jim Boyle, Austin, for Appellee.

PER CURIAM.

In 1999, the Legislature amended the Public Utility Regulatory Act (PURA) to usher in deregulation of retail electric utility rates in Texas.[1] As part of that plan, the Legislature concluded that, subject to certain restrictions, an existing utility like TXU Electric Company may recover amounts that the PURA defines as "regulatory assets" by using securitization financing. Securitization is accomplished through a financing order issued by the Commission that authorizes a utility to issue transition bonds. The transition bonds are repaid or secured by transition charges to ratepayers in a utility's service area. TXU requested the Commission to issue a financing order securitizing certain of its regulatory assets. The Commission authorized securitization of some but not all of those assets. A district court reversed the Commission's order in part and remanded the case for further proceedings. TXU and others bring this direct appeal to our Court.[2]

[1]     Act of May 27, 1999, 76th Leg., R.S., ch. 405, 1999 Tex. Gen. Laws 2543.

[2]     TEX. UTIL.CODE § 39.303(f) (providing that review of financing orders under the PURA are to be directly appealed from the district court to this Court).

We hold that: 1) in order to ensure that securitization provides tangible and quantifiable benefits to ratepayers

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

TXU Elec. Co. v. Public Utility Com'n of Texas, 51 S.W.3d 275 (2001)

Util. L. Rep. P 26,789, 44 Tex. Sup. Ct. J. 854, 44 Tex. Sup. Ct. J. 1126

## V

Several parties who are also parties in *Corpus Christi* raise many of the same issues in both cases.[37] Our decision in CP & L resolves each of these issues, and we will not lengthen this opinion by reiterating all the reasons for our holdings. We instead briefly summarize each issue and our disposition.

[37]  Those parties include the Office of Public Utility Counsel, Texas Industrial Consumers, and Nucor Steel, who filed an amicus brief with this Court in *Corpus Christi.*

Certain of TXU's customers assert that the Commission failed to follow section 39.253 in allocating transition costs to the **\*287** non-firm industrial customer classes. They contend that the Commission erred in applying the 150 percent demand allocator required by section 39.253(d)[38] to all the transition costs rather than first subtracting the transition costs allocated to residential customers. We hold in this case, as we do in *Corpus Christi,* that section 39.253 is ambiguous in this regard and that the Commission's construction is a reasonable one and should be accorded deference.

[38]  TEX. UTIL.CODE § 39.253(d) (requiring that "[n]on-firm industrial customers shall be allocated stranded costs equal to 150 percent of the amount allocated to that class").

TIEC says that in determining how much of the transition costs should be allocated to the industrial classes, the Commission should have excluded load lost when customers switched to sources of power that exempt them from paying transition charges.[39] Again, for the reasons we consider in *Corpus Christi,* we reject that argument.[40]

[39]  *See id.* § 39.262(k).

[40]  51 S.W.3d at 259 – 261.

## VI

[5]  Several parties to this appeal, including the Commission, contend that the district court erred when it held that the Commission's Finding of Fact 113 and references to that finding in Conclusion of Law 41 and Ordering Paragraph 37 were "advisory and superfluous to the Order and therefore [have] no *res judicata* effect." The finding of the Commission that is at issue concerned loss on reacquired debt.

TXU reacquired preferred stock and high-cost debt before the maturity date of that debt by paying a premium. The loss TXU sustained in those transactions is included in the definition of regulatory assets under the PURA, and the Commission allowed TXU to include loss on reacquired debt as part of the amount securitized in the financing order. This same loss on reacquired debt is also reflected as an increase in TXU's cost of capital, and that in turn increases TXU's rate of return. The Commission and others were concerned that TXU would enjoy a double recovery of its losses. Responding to that concern, the Commission concluded that loss on reacquired debt "should not be removed from [TXU's] cost-of-capital calculation for purposes of the annual report submitted pursuant to PURA § 39.257," but that instead an adjustment should be made in future proceedings.[41] In the Financing Order, Finding of Fact 113, the Commission said that:

[41]  Tex. Pub. Util. Comm'n, *Application of TXU Electric Company for Financing Order to Securitize Regulatory Assets and Other Qualified Costs,* Docket No. 21527 (May 2, 2000).

[A]n adjustment should be made in the true up proceeding under PURA § 39.262 to account for the effect of securitizing the loss on reacquired debt on [TXU's] cost of capital. This treatment is necessary to comply with the Legislature's mandate in PURA § 39.262(a) that a utility and its affiliates "may not be permitted to overrecover stranded costs" by using any of the methods provided in Chapter 39 [§ 39.262(a) ]. In addition, any determinations regarding the effect of securitizing loss on reacquired debt on the calculation of stranded costs should not be made in this docket but should be made in [TXU's] cost unbundling case under PURA § 39.201.[42]

[42]  *Id.* (footnote omitted).

We agree with the district court that this was an advisory and premature finding. **\*288** Whether an adjustment is required in a true-up or other future proceeding should

| Code of Federal Regulations |
| Title 47. Telecommunication |
| Chapter I. Federal Communications Commission (Refs & Annos) |
| Subchapter A. General |
| Part 1. Practice and Procedure (Refs & Annos) |
| Subpart J. Pole Attachment Complaint Procedures (Refs & Annos) |

47 C.F.R. § 1.1409

§ 1.1409 Commission consideration of the complaint.

Effective: June 8, 2011

Currentness

(a) In its consideration of the complaint, response, and reply, the Commission may take notice of any information contained in publicly available filings made by the parties and may accept, subject to rebuttal, studies that have been conducted. The Commission may also request that one or more of the parties make additional filings or provide additional information. Where one of the parties has failed to provide information required to be provided by these rules or requested by the Commission, or where costs, values or amounts are disputed, the Commission may estimate such costs, values or amounts it considers reasonable, or may decide adversely to a party who has failed to supply requested information which is readily available to it, or both.

(b) The complainant shall have the burden of establishing a prima facie case that the rate, term, or condition is not just and reasonable or that the denial of access violates 47 U.S.C. § 224(f). If, however, a utility argues that the proposed rate is lower than its incremental costs, the utility has the burden of establishing that such rate is below the statutory minimum just and reasonable rate. In a case involving a denial of access, the utility shall have the burden of proving that the denial was lawful, once a prima facie case is established by the complainant.

(c) The Commission shall determine whether the rate, term or condition complained of is just and reasonable. For the purposes of this paragraph, a rate is just and reasonable if it assures a utility the recovery of not less than the additional costs of providing pole attachments, nor more than an amount determined by multiplying the percentage of the total usable space, or the percentage of the total duct or conduit capacity, which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole, duct, conduit, or right-of-way.

(d) The Commission shall deny the complaint if it determines that the complainant has not established a prima facie case, or that the rate, term or condition is just and reasonable, or that the denial of access was lawful.

(e) When parties fail to resolve a dispute regarding charges for pole attachments and the Commission's complaint procedures under Section 1.1404 are invoked, the Commission will apply the following formulas for determining a maximum just and reasonable rate:

(1) The following formula shall apply to attachments to poles by cable operators providing cable services. This formula shall also apply to attachments to poles by any telecommunications carrier (to the extent such carrier is not a party to a pole attachment agreement) or cable operator providing telecommunications services until February 8, 2001:

$$\text{Maximum Rate} = \text{Space Factor} \times \frac{\text{Net Cost of}}{\text{a Bare Pole}} \times \frac{\text{Carrying}}{\text{Charge Rate}}$$

$$\text{Where Space Factor} = \frac{\text{Space Occupied by Attachment}}{\text{Total Usable Space}}$$

(2) With respect to attachments to poles by any telecommunications carrier or cable operator providing telecommunications services, the maximum just and reasonable rate shall be the higher of the rate yielded by paragraphs (e)(2)(i) or (e)(2)(ii) of this section.

(i) The following formula applies to the extent that it yields a rate higher than that yielded by the applicable formula in paragraph 1.1409(e)(2)(ii) of this section:

Rate = Space Factor x Cost

Where Cost

in Urbanized Service Areas = 0.66 x (Net Cost of a Bare Pole x Carrying Charge Rate)

in Non–Urbanized Service Areas = 0.44 x (Net Cost of a Bare Pole x Carrying Charge Rate).

$$\text{Where Space Factor} = \left[ \frac{\left( \text{Space Occupied} \right) + \left( \frac{2}{3} \times \frac{\text{Unusable Space}}{\text{No. of Attaching Entities}} \right)}{\text{Pole Height}} \right]$$

(ii) The following formula applies to the extent that it yields a rate higher than that yielded by the applicable formula in paragraph 1.1409(e)(2)(i) of this section:

$$\text{Rate} = \text{Space Factor} \times \text{Net Cost of a Bare Pole} \times \left[ \frac{\text{Maintenance and Administrative}}{\text{Carrying Charge Rate}} \right]$$

$$\text{Where Space Factor} = \left[ \frac{\left( \begin{array}{c} \text{Space} \\ \text{Occupied} \end{array} \right) + \left( \frac{2}{3} \times \frac{\text{Unusable Space}}{\text{No. of Attaching Entities}} \right)}{\text{Pole Height}} \right]$$

(3) The following formula shall apply to attachments to conduit by cable operators and telecommunications carriers:

$$\begin{array}{c} \text{Maximum} \\ \text{Rate per} \\ \text{Linear ft./m.} \end{array} = \underbrace{\left[ \frac{1}{\text{Number of Ducts}} \times \frac{1\ \text{Duct}}{\text{No. of Inner Ducts}} \right]}_{\text{(Percentage of Conduit Capacity)}} \times \underbrace{\left[ \begin{array}{c} \text{No. of} \\ \text{Ducts} \end{array} \times \frac{\text{Net Conduit Investment}}{\text{System Duct Length (ft./m.)}} \right]}_{\text{(Net Linear Cost of a Conduit)}} \times \begin{array}{c} \text{Carrying} \\ \text{Charge} \\ \text{Rate} \end{array}$$

simplified as:

$$\begin{array}{c} \text{Maximum Rate} \\ \text{Per Linear ft./m.} \end{array} = \frac{1\ \text{Duct}}{\text{No. of Inner Ducts}} \times \frac{\text{Net Conduit Investment}}{\text{System Duct Length (ft./m.)}} \times \begin{array}{c} \text{Carrying} \\ \text{Charge} \\ \text{Rate} \end{array}$$

If no inner-duct is installed the fraction, "1 Duct divided by the No. of Inner–Ducts" is presumed to be ½.

(f) Paragraph (e)(2) of this section shall become effective February 8, 2001 (i.e., five years after the effective date of the Telecommunications Act of 1996). Any increase in the rates for pole attachments that results from the adoption of such regulations shall be phased in over a period of five years beginning on the effective date of such regulations in equal annual increments. The five-year phase-in is to apply to rate increases only. Rate reductions are to be implemented immediately. The determination of any rate increase shall be based on data currently available at the time of the calculation of the rate increase.

**Credits**

[52 FR 31770, Aug. 24, 1987; 61 FR 43025, Aug. 20, 1996; 61 FR 45619, Aug. 29, 1996; 63 FR 12025, March 12, 1998; 65 FR 31282, May 17, 2000; 66 FR 34580, June 29, 2001; 76 FR 26639, May 9, 2011]

SOURCE: 43 FR 36094, Aug. 15, 1978; 56 FR 57598, Nov. 13, 1991; 57 FR 187, Jan. 3, 1992; 58 FR 27473, May 10, 1993; 59 FR 22985, May 4, 1994; 61 FR 45618, Aug. 29, 1996; 61 FR 46561, Sept. 4, 1996; 61 FR 52899, Oct. 9, 1996; 62 FR 37422, July 11, 1997; 63 FR 67429, Dec. 7, 1998; 63 FR 71036, Dec. 23, 1998; 64 FR 63251, Nov. 19, 1999; 65 FR 10720, Feb. 29, 2000; 65 FR 19684, April 12, 2000; 65 FR 31281, May 17, 2000; 69 FR 77938, Dec. 29, 2004; 71 FR 26251, May 4, 2006; 74 FR 39227, Aug. 6, 2009; 75 FR 9797, March 4, 2010; 76 FR 43203, July 20, 2011; 77 FR 71137, Nov. 29, 2012; 78 FR 10100, Feb. 13, 2013; 78 FR 15622, March 12, 2013; 78 FR 41321, July 10, 2013; 78 FR 50254, Aug. 16, 2013;

48528, Aug. 15, 2014; 80 FR 1268, Jan. 8, 2015, unless otherwise noted.

AUTHORITY: 15 U.S.C. 79, et seq.; 47 U.S.C. 151, 154(i), 154(j), 155, 157, 160, 201, 225, 227, 303, 309, 332, 1403, 1404, 1451, 1452, and 1455.

Notes of Decisions (23)

Current through April 30, 2015; 80 FR 24774.

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

| | |
|---|---|
| **Vernon's Texas Statutes and Codes Annotated** | |
| **Civil Practice and Remedies Code (Refs & Annos)** | |
| **Title 2. Trial, Judgment, and Appeal** | |
| **Subtitle C. Judgments** | |
| **Chapter 37. Declaratory Judgments (Refs & Annos)** | |

**V.T.C.A., Civil Practice & Remedies Code § 37.001**

**§ 37.001. Definition**

**Currentness**

In this chapter, "person" means an individual, partnership, joint-stock company, unincorporated association or society, or municipal or other corporation of any character.

**Credits**

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

Notes of Decisions (56)

V. T. C. A., Civil Practice & Remedies Code § 37.001, TX CIV PRAC & REM § 37.001
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

| Vernon's Texas Statutes and Codes Annotated |
| Civil Practice and Remedies Code (Refs & Annos) |
| Title 2. Trial, Judgment, and Appeal |
| Subtitle C. Judgments |
| Chapter 37. Declaratory Judgments (Refs & Annos) |

V.T.C.A., Civil Practice & Remedies Code § 37.002

§ 37.002. Short Title, Construction, Interpretation

Currentness

(a) This chapter may be cited as the Uniform Declaratory Judgments Act.

(b) This chapter is remedial; its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and it is to be liberally construed and administered.

(c) This chapter shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states that enact it and to harmonize, as far as possible, with federal laws and regulations on the subject of declaratory judgments and decrees.

**Credits**

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

Notes of Decisions (238)

V. T. C. A., Civil Practice & Remedies Code § 37.002, TX CIV PRAC & REM § 37.002
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

| Vernon's Texas Statutes and Codes Annotated |
| Civil Practice and Remedies Code (Refs & Annos) |
| Title 2. Trial, Judgment, and Appeal |
| Subtitle C. Judgments |
| Chapter 37. Declaratory Judgments (Refs & Annos) |

V.T.C.A., Civil Practice & Remedies Code § 37.003

§ 37.003. Power of Courts to Render Judgment; Form and Effect

Currentness

(a) A court of record within its jurisdiction has power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. An action or proceeding is not open to objection on the ground that a declaratory judgment or decree is prayed for.

(b) The declaration may be either affirmative or negative in form and effect, and the declaration has the force and effect of a final judgment or decree.

(c) The enumerations in Sections 37.004 and 37.005 do not limit or restrict the exercise of the general powers conferred in this section in any proceeding in which declaratory relief is sought and a judgment or decree will terminate the controversy or remove an uncertainty.

**Credits**

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

Notes of Decisions (284)

V. T. C. A., Civil Practice & Remedies Code § 37.003, TX CIV PRAC & REM § 37.003
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

| Vernon's Texas Statutes and Codes Annotated |
| --- |
| Civil Practice and Remedies Code (Refs & Annos) |
| Title 2. Trial, Judgment, and Appeal |
| Subtitle C. Judgments |
| Chapter 37. Declaratory Judgments (Refs & Annos) |

V.T.C.A., Civil Practice & Remedies Code § 37.004

§ 37.004. Subject Matter of Relief

**Effective: June 15, 2007**

Currentness

(a) A person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

(b) A contract may be construed either before or after there has been a breach.

(c) Notwithstanding Section 22.001, Property Code, a person described by Subsection (a) may obtain a determination under this chapter when the sole issue concerning title to real property is the determination of the proper boundary line between adjoining properties.

**Credits**

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985. Amended by Acts 2007, 80th Leg., ch. 305, § 1, eff. June 15, 2007.

Notes of Decisions (469)

V. T. C. A., Civil Practice & Remedies Code § 37.004, TX CIV PRAC & REM § 37.004
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Civil Practice and Remedies Code (Refs & Annos)
    Title 2. Trial, Judgment, and Appeal
      Subtitle C. Judgments
        Chapter 37. Declaratory Judgments (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 37.005

§ 37.005. Declarations Relating to Trust or Estate

Currentness

A person interested as or through an executor or administrator, including an independent executor or administrator, a trustee, guardian, other fiduciary, creditor, devisee, legatee, heir, next of kin, or cestui que trust in the administration of a trust or of the estate of a decedent, an infant, mentally incapacitated person, or insolvent may have a declaration of rights or legal relations in respect to the trust or estate:

(1) to ascertain any class of creditors, devisees, legatees, heirs, next of kin, or others;

(2) to direct the executors, administrators, or trustees to do or abstain from doing any particular act in their fiduciary capacity;

(3) to determine any question arising in the administration of the trust or estate, including questions of construction of wills and other writings; or

(4) to determine rights or legal relations of an independent executor or independent administrator regarding fiduciary fees and the settling of accounts.

**Credits**

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985. Amended by Acts 1987, 70th Leg., ch. 167, § 3.08(a), eff. Sept. 1, 1987; Acts 1999, 76th Leg., ch. 855, § 10, eff. Sept. 1, 1999.

Notes of Decisions (50)

V. T. C. A., Civil Practice & Remedies Code § 37.005, TX CIV PRAC & REM § 37.005

Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Civil Practice and Remedies Code (Refs & Annos)
        Title 2. Trial, Judgment, and Appeal
            Subtitle C. Judgments
                Chapter 37. Declaratory Judgments (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 37.0055

§ 37.0055. Declarations Relating to Liability for Sales and Use Taxes of Another State

Effective: September 1, 2007

Currentness

(a) In this section, "state" includes any political subdivision of that state.

(b) A district court has original jurisdiction of a proceeding seeking a declaratory judgment that involves:

(1) a party seeking declaratory relief that is a business that is:

(A) organized under the laws of this state or is otherwise owned by a resident of this state; or

(B) a retailer registered with the comptroller under Section 151.106, Tax Code; and

(2) a responding party that:

(A) is an official of another state; and

(B) asserts a claim that the party seeking declaratory relief is required to collect sales or use taxes for that state based on conduct of the business that occurs in whole or in part within this state.

(c) A business described by Subsection (b)(1) is entitled to declaratory relief on the issue of whether the requirement of another state that the business collect and remit sales or use taxes to that state constitutes an undue burden on interstate commerce under Section 8, Article I, United States Constitution.

(d) In determining whether to grant declaratory relief to a business under this section, a court shall consider:

(1) the factual circumstances of the business's operations that give rise to the demand by the other state; and

(2) the decisions of other courts interpreting Section 8, Article I, United States Constitution.

**Credits**

Added by Acts 2007, 80th Leg., ch. 699, § 1, eff. Sept. 1, 2007.

V. T. C. A., Civil Practice & Remedies Code § 37.0055, TX CIV PRAC & REM § 37.0055
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

| Vernon's Texas Statutes and Codes Annotated |
|---|
| Civil Practice and Remedies Code (Refs & Annos) |
| Title 2. Trial, Judgment, and Appeal |
| Subtitle C. Judgments |
| Chapter 37. Declaratory Judgments (Refs & Annos) |

V.T.C.A., Civil Practice & Remedies Code § 37.006

§ 37.006. Parties

Currentness

(a) When declaratory relief is sought, all persons who have or claim any interest that would be affected by the declaration must be made parties. A declaration does not prejudice the rights of a person not a party to the proceeding.

(b) In any proceeding that involves the validity of a municipal ordinance or franchise, the municipality must be made a party and is entitled to be heard, and if the statute, ordinance, or franchise is alleged to be unconstitutional, the attorney general of the state must also be served with a copy of the proceeding and is entitled to be heard.

**Credits**

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

Notes of Decisions (188)

V. T. C. A., Civil Practice & Remedies Code § 37.006, TX CIV PRAC & REM § 37.006
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
Civil Practice and Remedies Code (Refs & Annos)
Title 2. Trial, Judgment, and Appeal
Subtitle C. Judgments
Chapter 37. Declaratory Judgments (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 37.007

§ 37.007. Jury Trial

Currentness

If a proceeding under this chapter involves the determination of an issue of fact, the issue may be tried and determined in the same manner as issues of fact are tried and determined in other civil actions in the court in which the proceeding is pending.

**Credits**

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

Notes of Decisions (11)

V. T. C. A., Civil Practice & Remedies Code § 37.007, TX CIV PRAC & REM § 37.007
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

| Vernon's Texas Statutes and Codes Annotated |
| Civil Practice and Remedies Code (Refs & Annos) |
| Title 2. Trial, Judgment, and Appeal |
| Subtitle C. Judgments |
| Chapter 37. Declaratory Judgments (Refs & Annos) |

V.T.C.A., Civil Practice & Remedies Code § 37.008

§ 37.008. Court Refusal to Render

Currentness

The court may refuse to render or enter a declaratory judgment or decree if the judgment or decree would not terminate the uncertainty or controversy giving rise to the proceeding.

**Credits**

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

Notes of Decisions (25)

V. T. C. A., Civil Practice & Remedies Code § 37.008, TX CIV PRAC & REM § 37.008
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

| Vernon's Texas Statutes and Codes Annotated |
| --- |
| Civil Practice and Remedies Code (Refs & Annos) |
| Title 2. Trial, Judgment, and Appeal |
| Subtitle C. Judgments |
| Chapter 37. Declaratory Judgments (Refs & Annos) |

V.T.C.A., Civil Practice & Remedies Code § 37.009

§ 37.009. Costs

Currentness

In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just.

**Credits**

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

Notes of Decisions (703)

V. T. C. A., Civil Practice & Remedies Code § 37.009, TX CIV PRAC & REM § 37.009
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**　　　　© 2015 Thomson Reuters. No claim to original U.S. Government Works.

| Vernon's Texas Statutes and Codes Annotated |
| :--- |
|   Civil Practice and Remedies Code (Refs & Annos) |
|     Title 2. Trial, Judgment, and Appeal |
|       Subtitle C. Judgments |
|         Chapter 37. Declaratory Judgments (Refs & Annos) |

**V.T.C.A., Civil Practice & Remedies Code § 37.010**

**§ 37.010. Review**

**Currentness**

All orders, judgments, and decrees under this chapter may be reviewed as other orders, judgments, and decrees.

**Credits**

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

Notes of Decisions (64)

V. T. C. A., Civil Practice & Remedies Code § 37.010, TX CIV PRAC & REM § 37.010
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

**Vernon's Texas Statutes and Codes Annotated**
**Civil Practice and Remedies Code (Refs & Annos)**
**Title 2. Trial, Judgment, and Appeal**
**Subtitle C. Judgments**
**Chapter 37. Declaratory Judgments (Refs & Annos)**

**V.T.C.A., Civil Practice & Remedies Code § 37.011**

**§ 37.011. Supplemental Relief**

**Currentness**

Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper. The application must be by petition to a court having jurisdiction to grant the relief. If the application is deemed sufficient, the court shall, on reasonable notice, require any adverse party whose rights have been adjudicated by the declaratory judgment or decree to show cause why further relief should not be granted forthwith.

**Credits**

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

Notes of Decisions (23)

V. T. C. A., Civil Practice & Remedies Code § 37.011, TX CIV PRAC & REM § 37.011
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

| Vernon's Texas Statutes and Codes Annotated |
| Utilities Code (Refs & Annos) |
| Title 2. Public Utility Regulatory Act |
| Subtitle C. Telecommunications Utilities |
| Chapter 54. Certificates (Refs & Annos) |
| Subchapter E. Municipalities |

V.T.C.A., Utilities Code § 54.205

§ 54.205. Municipality's Right to Control Access

Currentness

This title does not restrict a municipality's historical right to control and receive reasonable compensation for access to the municipality's public streets, alleys, or rights-of-way or to other public property.

**Credits**

Acts 1997, 75th Leg., ch. 166, § 1, eff. Sept. 1, 1997.

**Editors' Notes**

**REVISOR'S NOTE**

**2007 Main Volume**

Section 3.2555(f), V.A.C.S. Article 1446c-0, provides that the law does not "restrict or limit" certain municipal rights. The revised law omits the term "limit" because "limit" is included within the meaning of the term "restrict."

Notes of Decisions (3)

V. T. C. A., Utilities Code § 54.205, TX UTIL § 54.205
Current through the end of the 2013 Third Called Session of the 83rd Legislature